JAMES WILSON

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

1. JUROR—*competency, in what manner to be questioned.* This court can not inquire into the competency of a juror, where the record fails to show that the question of his competency was presented to the court below by challenge for cause or otherwise, the bill of exceptions simply showing that after the juror was examined touching his competency, he was challenged peremptorily.

2. SAME—*competency of a juror as having formed an opinion.* A person called as a juror in a criminal case where the defendant was indicted for murder, stated, in response to questions touching his qualifications as a juror: "I have read newspaper accounts of the commission of the crime with which the defendant is charged, and have also conversed with several persons in regard to it since coming here, and during my attendance upon this term of court,—do not know whether they are witnesses in the case or not—do not know who the witnesses in the case are. From accounts I have read and from conversations I have had, I have formed an opinion in the case, and would have an opinion in the case now if the facts should turn out as I heard them, and I think it would take some evidence to remove that opinion. Would be governed by the evidence in the case, and can give the defendant a fair and impartial trial according to the law and the evidence." A challenge for cause in behalf of the defendant having been denied, the juror was challenged peremptorily. It was *held,* the juror was competent. The opinion formed seems not to have been decided, but one of a light and transient character, which, at no time, would have disqualified the juror from serving. But aside from this, all objection as to his competency in respect to any opinion he seems to have formed was removed by the statute. Rev. Stat. 1874, 633, § 14.

3. SAME—*effect of peremptory challenge where challenges not exhausted.* In this case the defendant, in the selection of the jury by whom he was tried, exhausted only two of his peremptory challenges, so that even if the juror

94 299
122 262

94 299
144 187
144 196

94 299
45a 191

94 299
52a 497

94 299
187 ³257

94 299
198 ⁸187

94 299
202 ¹¹ 65

94 299
110a ³ 16

was erroneously held to be competent, and the defendant thus compelled to accept him or to challenge him peremptorily, no harm could have resulted, and the error would not be ground of reversal.

4. CRIMINAL LAW—*self-defence.* The law does not allow a person to wilfully bring an attack upon himself for the purpose of getting an opportunity to kill his assailant, and then justify on the ground that he was acting only in his necessary self-defence. So where a person pursues another to his place of refuge, with malice, and actuated by a desire for revenge, and invites the peril of an attack upon himself in order that he may have an opportunity to kill his assailant, if he thus draws an attack and kills his assailant, the act of killing is murder.

5. SAME—*threats.* Where threats to take life are made, it has been held that before a party may attack or inflict harm upon the person making the threats, there must be some overt act from which an intention may be reasonably inferred to carry into effect the threats, and the danger must be imminent.

6. SAME—*of evidence as to motive of witness.* One McDonald, while in the store of another, was shot and killed by one Zack Wilson. On the trial of a brother of Zack, on the charge of murder, as having advised and aided in the act of killing, the proprietor of the store in which the killing was done, and who was present at the time, was a witness, and in answer to the question by the prosecution: "Will you tell the jury how you came to load your gun?" said: "I had an intimation that Zack was coming there to shoot McDonald, and I was loading my gun to protect my house." As original testimony this would doubtless have been objectionable. But on cross-examination the defendant had drawn from the witness the fact that he was loading his gun when Zack approached McDonald, necessarily with the view to raise some unfavorable inference against the witness, or some favorable inference in behalf of the defendant,—and under the circumstances there was no impropriety in getting at the motive of the witness in loading his gun.

7. SAME—*as to declarations of the person killed.* In the case mentioned, inasmuch as the line of defence justified the shooting of McDonald as in necessary self-defence of Zack, it was competent, in rebuttal of that theory, to show that McDonald was not aggressive, but on the contrary acting on the defensive, and to that end, any of his declarations explanatory of accompanying acts would be admissible as a part of the *res gestæ.*

8. SAME—*declarations of a co-conspirator.* Where several persons have conspired to have done an unlawful act, the declarations of one of them in respect of the subject matter of the conspiracy, made after the conspiracy has been formed, are admissible in evidence against his co-conspirators.

9. But declarations in respect to the proposed unlawful act, made by one of the parties before the conspiracy was entered into, will not be competent evidence against other persons who subsequently joined in the conspiracy to do the threatened act. Though in this case the admission of such declara-

tions against a subsequent co-conspirator was held not to be ground of reversal, as the evidence could have done no harm, under the circumstances of the case, to the party against whom they were admitted.

10. ERROR—*improper argument by counsel.* Although a State's attorney may have indulged in much intemperance of speech in his closing argument in a criminal case, yet, if it does not appear that the attention of the presiding judge was called to the circumstance, it can not be said the court erred in not checking the counsel.

11. ERROR WILL NOT ALWAYS REVERSE. But even if there were error in that regard, it would not authorize the reversal of a judgment clearly right under the evidence. Where the result reached by a judgment is clearly right, it will never be reversed for errors which do not affect the substantial merits of the case.

WRIT OF ERROR to the Circuit Court of Hancock county; the Hon. JOSEPH SIBLEY, Judge, presiding.

Mr. HENRY W. DRAPER, and Mr. BRYANT T. SCOFIELD, for the plaintiff in error:

The jurors Gray and Garlinghauser were incompetent, having both formed an opinion from what they had read and heard, and stating that it would require some evidence to remove their several opinions. They were challenged for cause and the challenge overruled, when they were challenged peremptorily. It will not do to say that the defendant was not injured in being compelled to use his peremptory challenges as to them because the bill of exceptions fails to show he exhausted his peremptory challenges. Prudence would require an attorney to be careful not to exhaust his right to such challenges, and to accept jurors he dislikes rather than do so, for fear of getting still more objectionable jurors forced on him. *Baxter* v. *The People,* 3 Gilm. 376; *Gray et al.* v. *The People,* 26 Ill. 344.

The court erred in admitting in evidence the threats made by Zachariah Wilson, in Colmar on the Saturday evening before the killing took place, as there was no pretence that there was any conspiracy between him and the defendant before the next Monday, when the killing did take place. There being no conspiracy at the time these threats were made, they could

not affect the defendant on trial, as he was no party to them and knew nothing of them at the time. After a conspiracy is formed, anything said or done by any one of the conspirators *in pursuance of the original* concerted plan is evidence against each, but what any one of the conspirators said or did before the conspiracy was formed, or after the object of the conspiracy has been accomplished, is evidence against him alone. 2 Russ. on Crimes, 697; 1 Phil. on Ev. 201, (9th ed.); 3 Arch. Crim. Prac. and Pl. 6th ed. by Waterman, 621–2, and note; 1 Greenlf. Ev. sec. 111.

The declarations of Zachariah Wilson had no tendency to further or promote any common criminal intent so as to become a part of the *res gestœ.* They were mere hearsay, and not admissible to prove the body of the crime against the prisoner, or to prove the existence of a conspiracy. *Clawson* v. *State,* 14 Ohio State, 234–8; *Fouts* v. *State,* 7 id. 471 ; Roscoe's Crim. Ev. 84 and 617; 1 Starkie's Ev. 406–7; *Browning* v. *State,* 30 Miss. 656–666.

The fourth, fifth and twenty-sixth of the people's instructions given had attached to each a brief of authorities. This was highly improper, and we think error, as giving undue weight and prominence to them. *Wright* v. *Prosseau,* 73 Ill. 381.

The ninth instruction informed the jury that if they believed the defendant had wilfully and knowingly sworn falsely to any material fact in the case they might disregard his entire testimony, except so far as the same was corroborated by *other witnesses whose testimony they believed to be true.*

The latter clause of this instruction ignores all the evidence in the case except that of "other witnesses," such as the acts of the parties, which is generally the strongest kind of evidence, and the jury might well understand from it that it was left to them to determine without restriction whom to believe or disbelieve. *Hartford Life Ins. Co.* v. *Gray et al.* 80 Ill. 28–31.

The 13th instruction for the people proceeds upon the

assumption that all the parties indicted were acting together in pursuance of a common, unlawful and felonious design against the person of McDonald. This was one of the disputed facts, and the jury should have been left free to say from the evidence if the defendant did so act. *Roach et al.* v. *People,* 77 Ill. 29; *Adams* v. *Smith,* 58 Ill. 421; *Durham* v. *Goodwin.* 54 Ill. 470.

Messrs. MASON & GRIFFITH, for the People:

The jurors had no such fixed opinions as to disqualify them. They were only hypothetical, and not decided. *Smith* v. *Eames,* 3 Scam. 81; *Gardner* v. *People,* id. 89; *Thompson* v. *People,* 24 Ill. 65; *Leach* v. *People,* 53 Ill. 317.

But if the challenges to them were improperly overruled, the defendant was not prejudiced thereby, as he excused the jurors peremptorily, and did not exhaust his peremptory challenges in the selection of the jury. *Mingia* v. *People,* 54 Ill. 274.

It is the well settled rule of this court that it will not grant a new trial or reverse a judgment where it appears from the entire record that justice has been done, and that the errors complained of could not have affected the merits of the case. *Greenup* v. *Stoker,* 3 Gilm. 202; *Winnesheik Ins. Co.* v. *Schuelter,* 60 Ill. 473; *St. Louis and Southeastern Railway Co.* v. *Lux,* 63 Ill. 525; *Robinson et al.* v. *Randall,* 82 Ill. 523; *Roach* v. *People,* 53 Ill. 317.

The question whether or not evidence is admissible and improper can not be raised for the first time in this court. It must be objected to in the court below, and the record must show it, and show that the ruling was excepted to. *Snyder* v. *Laframboise,* Bre. 343; *McKinney* v. *People,* 2 Gilm. 552; *Holmes* v. *People,* 5 Gilm. 480; *Clay* v. *Boyer,* 5 Gilm. 508; *Miner* v. *Philips,* 42 Ill. 131; *Mingia* v. *People,* 54 Ill. 274; *Gardner* v. *Haynie,* 42 Ill. 292; *Beebe* v. *People,* 73 Ill. 320; *Earl* v. *People,* 73 Ill. 329; *Humphreyville* v. *Culver, Page & Hoyne,* 73 Ill. 329.

The threats of Zachariah Wilson, made in Colmar on the Saturday before the killing of McDonald, were properly admitted as tending to show malice on the part of Zachariah, and characterizing the act of killing by him as murder. The defendant was tried as an accessory to the murder, and hence it became necessary to show what crime the act of the principal actor in the tragedy amounted to. If it was not murder, then the defendant could not have been convicted as accessory thereto. *Brennan* v. *People,* 15 Ill. 511; *Regina* v. *Murphy,* 8 C. & P. 744; *Regina* v. *Shellard,* 9 C. & P. 170; *Crowningshield's case,* 10 Pick. 497; *People* v. *Mather,* 4 Wend. 257; 1 Phil. Ev. 194–197, note 5, p. 197.

The giving or refusing of an instruction stating merely an abstract proposition of law can not be assigned for error. *Reynolds* v *Greenbaum,* 80 Ill. 416; *Ryan* v. *Donelly,* 71 Ill. 100; *Tuttle et al.* v. *Robinson,* 78 Ill. 332.

If the whole series of instructions present the law fully and fairly to the jury, this court will not reverse because some of them may appear insufficient or erroneous when considered independently. *Toledo, Wabash and Western Railway Co.* v. *Ingraham,* 77 Ill. 309; *Stowell* v. *Beagle,* 79 Ill. 525; *Kennedy* v. *People,* 40 Ill. 502; *Northern Line Packet Co.* v. *Binninger,* 71 Ill. 511; *Latham* v. *Roach,* 72 Ill. 179; *Smith* v. *People,* 74 Ill. 146.

Mr. Justice Scholfield delivered the opinion of the Court:

An indictment was returned by the grand jury of Hancock county into the circuit court of that county, at its October term, 1876, against Zachariah Wilson, *alias* Zack Wilson, Nicholas Wilson, *alias* Nick Wilson, and James Wilson, for the murder of Thomas McDonald.

James Wilson was put upon his trial alone, upon that indictment, at the March term, 1877, of the Hancock circuit court. The jury returned a verdict of guilty, as charged in the indictment, against him, and fixed his punishment at fourteen

years imprisonment in the penitentiary.   The court, after over-
ruling motions for a new trial and in arrest of judgment, gave
judgment upon the verdict of the jury, and the present writ
of error is prosecuted to reverse that judgment.

While empanneling the jury, William Gray was called as
a juror in the case, and, being first duly sworn, testified, in
response to questions touching his qualifications as a juror:
" I have read newspaper accounts of the commission of the
crime with which the defendant is charged, and have also
conversed with several persons in regard to it since coming
to Carthage and during my attendance upon this term of
court; do not know whether they are witnesses in the case or
not; do not know who the witnesses in the case are.   From
accounts I have read and from conversations I have had, I
have formed an opinion in the case; would have an opinion
in the case now, if the facts should turn out as I heard them,
and I think it would take some evidence to remove that
opinion ; would be governed by the evidence in the case, and
can give the defendant a fair and impartial trial, according to
the law and the evidence."   The defendant, by his counsel,
thereupon challenged said Gray, for cause, but the court re-
fused to allow the challenge, and held that he was a competent
juror to try the case.   To this the defendant excepted, and
then challenged Gray peremptorily.

A. A. Garlinghauser was also called as a juror in the case,
and, after he was examined touching his qualifications as a
juror, the defendant challenged him peremptorily.

The point is made that the court erred in holding these
jurors to be competent.

The question of Garlinghauser's competency was not raised
in the court below.   The bill of exceptions simply shows that,
after his examination touching his competency, the defendant
challenged him peremptorily.   It fails to show that the ques-
tion of his competency was presented to the court by chal-
lenge for cause or otherwise.

We think all objection to Gray's competency is clearly removed by the statute, if indeed he would have been incompetent otherwise. It provides in two of the clauses of sec. 14, chap. 78 (Rev. Stat. 1874, p. 633,) as follows: "*Provided, further,* that it shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state, on oath, that he believes that he can render an impartial verdict according to the law and the evidence: *And, provided, further,* that in the trial of any criminal cause, the fact that a person called as a juror has formed an opinion or impression based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion), shall not disqualfy him to serve as a juror in such case, if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

The opinion formed seems not to have been decided, but one of a light and transient character which, at no time, would have disqualified the juror from serving. It was said, in *Smith* v. *Eames,* 3 Scam. 81, "If the opinion be merely of a light and transient character, such as is usually formed by persons in every community, upon hearing a current report, and which may be changed by the relation of the next person met with, and which does not show a conviction of the mind and a fixed conclusion thereon, or if it be hypothetical, the challenge ought not to be allowed." See also, to the same effect, *Gardner* v. *The People,* 3 Scam. 88; *Thompson* v. *The People,* 24 Ill. 65; *Leach* v. *The People,* 53 id. 317.

But even if the juror had been incompetent, still, under the ruling in *Robinson* v. *Randall,* 82 Ill. 522, holding that he was competent was an error that did no harm, and could not, therefore, be held to be ground for reversal. The defendant exhausted but two of his peremptory challenges, and hence, when he accepted the jurors by whom he was

tried, he was entitled to eighteen peremptory challenges; and it must, therefore, be presumed the jurors by whom he was tried were entirely unobjectionable to him.

The most important question in the case, and that to which our attention shall now be directed, is, whether the verdict is against the law and the evidence?

The fact that Thomas McDonald was shot and killed by Zachariah Wilson, in Wade's drug store, in the town of Plymouth, Hancock county, on Monday, the 14th of August, 1876, is not controverted. It is controverted, however, 1st, that James Wilson was a party to that killing; and 2d, that such killing was felonious.

The evidence shows, that on Saturday, the 12th day of August, 1876, Zachariah Wilson and Thomas McDonald were in Plymouth. Wilson had got on his horse to go home, and, whilst his horse was drinking at a public well, McDonald seized the bridle and threatened to whip Wilson—cursing and abusing him with loud and profane epithets—and daring him to get off his horse and fight. Wilson seems to have taken this very quietly, at the time, remaining on his horse, and, when ready to go, disengaging McDonald's hold without difficulty. The witnesses all concur that he let his horse walk off at a moderate pace, and kept watching McDonald over his shoulder, who followed him for some distance, abusing him, threatening him, and challenging him to fight. Some of the witnesses think McDonald had a knife or pistol, or both, in his hands at the time, while others, with equal opportunity for observation, deny that he displayed any weapons whatever. Some of the witnesses also say that McDonald, at this time, threatened to kill Wilson, while others, with equal opportunity of hearing, deny that he made such threats. Without stopping to consider on which side is the weight of evidence in these respects, we think it sufficient to say that all of the witnesses concur that McDonald did not use, or attempt to use, any weapon upon Wilson; and they also concur in describing such conduct on the part of

Wilson, as pretty clearly indicated, that he, in fact, had no fear of McDonald. It is shown, however, that his anger was aroused, and that he resolved to have revenge.

Zachariah Wilson, when examined as a witness, admitted that he intended, on Monday, the 14th of August, to cowhide McDonald, qualifying it, however, with the proviso, "if McDonald did not let him alone."

Whether the defendant was in Plymouth, on Saturday, is not certain,—both he and Zachariah deny that he was—but one of the defendant's witnesses (Washington) makes McDonald say, on Saturday, that he was threatening him and Zachariah, and he would kill both before they left town. This, doubtless, is not very reliable; but it is certain, at all events, that defendant learned, in some way, on Saturday, that there had been trouble between Zachariah and McDonald on that day; for he says, in his direct examination as a witness, "I had been informed, on Saturday, that McDonald, with the Barkers, had assaulted Zack."

The defendant, Zachariah, and Nicholas Wilson, are brothers, and, at that time, they lived in the country, within a few miles of Colmar, though not all in the same locality. On Monday morning, August 14, 1876, three of the Wilsons, (probably not including the defendant, as he denies that he was with them, and the proof does not show affirmatively with certainty that he was) and a cousin of theirs, called "Arch Allen," were in Colmar, as it appears, to take the train for Plymouth.

Andrew Way, testifying on behalf of the prosecution, says: "I was in Colmar the Monday morning that McDonald was killed; saw the Wilsons and Allen come in Colmar together; there were four of them; came in two buggies; they all took the train together for Plymouth." This witness also shows why these parties went to Plymouth on that morning. He says that he, himself, went to Plymouth in the afternoon, and, on cross-examination as to his motives for going there, he said: "I had two reasons for going to Plymouth. * * *

The other reason was, when I went into the saloon where the Wilsons and Allen were that morning, one of them said, 'Tom McDonald will be the worst hurt man in Plymouth before night;' and, just like any other fool, I had my curiosity aroused, and went down to see what would turn up."

Whether the defendant went from Colmar to Plymouth on the same train with his brothers and cousin, or not, it is certain that he also went to Colmar on the same morning, and there took the train for Plymouth,—and that Zachariah, James and Nicholas Wilson, and Arch Allen, were all in Plymouth by noon, or a little after that time.

The next account the evidence gives of these parties is, Zachariah and the witness Marion Curry, not far from noon, were playing cards, for money, at an old hay-press. This was only about fifty yards south of the street on which is Wade's drug store, in which McDonald was killed. When in the middle of the game, some one came below and called up: "Zack, Jim wants you!" The witness saw no one, but recognized the voice calling to be that of Nicholas Wilson. Zachariah immediately threw down the cards, got up, and departed without saying a word. Zachariah, in his examination, admits that it was his brother Nicholas who called him, and he says: "Nick came and said he wanted to see me, and told me McDonald had come to town, and I had better look out for him; that McDonald and I had had trouble before, and I had better be careful. We went to Bagby's store, and, I think, got a drink there. Went from there to the harness shop. Met Romine Smith, and talked about the affair on Saturday," etc.

The village of Plymouth contains a public square, with a street on each side of the square, and four streets, being one from each point of the compass, terminating opposite the center of the square. Wade's drug store is on the street running east and west, on the south side of the square. It is near the south-east corner of the square, and faces to the north. Metzger's store is 30 or 40 feet east of Wade's drug store, and adjoins, on the east side, the street running from the south,

opposite to the center of the square.   There is a stairway on
the east side of this store, running up to the second story of
the building, and affording access to Rallston's harness shop,
which was then kept there.   Bagby's store is just across the
street from Metzger's store, facing north, and King's store is
a few feet still west of Bagby's store.   Shafer's drug store is on
the street running north and south, on the east side of the
square, near its south-east corner, facing west.   It is about
150 feet diagonally across from Shafer's drug store to Wade's
drug store.   Just north, a few feet, of Shafer's drug store is
Miller's hardware store, also facing west.   On the north side
of the street running from the east, opposite the center of the
square, and facing to the west, is the Rallston House; and
farther north, on the same street, and near the north-east cor-
ner of the square, and also facing west, is the postoffice.

When Zachariah met Romine Smith, as Smith says, he was
in front of King's store, and Zachariah was coming down the
street from the west.   Smith says, "he came up toward me,
and, looking me in the face with a peculiar smile, said: 'There
is going to be a man in Plymouth get a ——— good cowhid-
ing to-day.'   I said: 'Who, Zack?'   He repeated it, that some
one would get a ——— cowhiding before night.   I asked him
again who he meant.   He said: 'Thomas McDonald.'   Just
then Nick Wilson came up from the east, towards Bagby's
store, and beckoned to Zack to step to one side.   Zack and he
talked together a few minutes in a low tone, but I could not
hear what they said.   They then started east.   They went
down by Metzger's store, and went up into Rallston's harness-
shop."   This same witness says that about ten minutes before
hearing the conversation with Zachariah, he had a conversa-
tion with Nicholas, and that while they were talking Thomas
McDonald rode up and tied his horse in front of Wade's drug
store.   Thereupon Nicholas said: "Yonder is a man that
will be the worst hurt man in Plymouth before night.   I
said: 'Who?'   He said: 'Old Tom McDonald.'   He then
started off south."   That was in the direction of the old hay-

press, where Zachariah, as we have before seen, was playing cards; and so, this conversation must have been before, and that with Zachariah after, Zachariah was called away from the hay-press, by Nicholas, to see the defendant.

After Zachariah and Nicholas went into the harness shop, other witnesses take up the narrative. Samuel Rallston, the proprietor of the shop, says: " Zack and Nick Wilson came in there," (the shop) "just after noon the day McDonald was killed. They were looking at the whips. Zack asked for a rawhide. I didn't have any. One of them laughed and said: ' Black-snake will do as well for driving a threshing machine.' * * * James Wilson came to the head of the stairs and said something, and they all went away together."

Silas Wright, another witness present in the harness shop when they were there, corroborates Rallston as to what occurred.

Zachariah Wilson, in his evidence, admitted that his object in going into the harness shop was to get a cowhide to use on McDonald. He said: "Went with Nick to harness shop; asked for a cowhide; I wanted to use it—to use it on McDonald, if he kept on abusing me, and intended to get a cowhide if Rallston had any."

Silas Wright says, when the Wilsons were in the harness shop, "Jim," the defendant, came to the head of the stairs, put his head in at the door and asked for something, which the witness thought was a revolver. All three then went down together.

When McDonald hitched his horse, as alluded to in the evidence of Romine Smith, he went directly across the street to Wade's drug store. Samuel Wade was then sitting on a box in front of the store, between the door and the door of Wade's doctor's office, which was annexed to and east of his drug store; and he says, just after McDonald came across, he saw the defendant up by Bagby's store. McDonald remained and talked with Wade awhile, and then went into the drug store.

Charles Cox, a clerk in the drug store, says: "McDonald came into the store a little after noon and sat on the west counter. There are two counters in the store—one on the east and one on the west.side. The door is in the middle in front, and a window on each side of the door at the ends of the counter. James Wilson and Allen came into the store and started towards McDonald, looking him right in the face. They walked pretty fast. Both had their coats off. Neither spoke until they got within about six feet of McDonald, when McDonald jumped off the counter, pulled a revolver, and said: '—— you, stop; don't you come any nearer. You have come to get the drop on me, but you shan't.' * * * I think McDonald pulled out his revolver as he jumped off the counter; * * * he followed them to the door—soon after came back into the store." * * *

Henry Kneff says: * * * "I went into Wade's drug store and saw McDonald sitting on the counter. When Jim Wilson and Allen came in I was taking a drink of water at the south end of the counter. I saw James step into the door; he came in on a fast walk. Allen followed him. Heard McDonald say: 'Stop; you are after me; you want to get the drop on me, but you shan't do it.' James said, 'I am not,' and turned and went out. They were walking towards McDonald. Heard a pistol click, and McDonald raised it towards James. He kept on talking and followed them to the door."

George Barker says: "I was near Metzger's when James Wilson and another man they called Allen passed by, going to Wade's store. Soon after they came out on the run. Jim went up to the harness shop. In a short time Jim, Zack and Nick were all down on the sidewalk. They made two or three steps towards Wade's, when McDonald stopped them."

After the defendant and Allen were thus driven out of Wade's drug store, the evidence shows that McDonald made no effort to inflict violence, but stood with one foot in the door and the other on the sidewalk, brandishing a revolver

in one hand and a knife in the other, telling the Wilsons they must keep away from him,—that all that he asked of them was to keep away from him, etc. He was very profane and abusive towards all of the Wilsons, and especially towards Zachariah, whom he charged with ruining his family by debauching his daughter. He remained standing while abusing them, but afterwards sat down on the box, before alluded to as being in front of the store, and sat there for a little while, and then returned into the store and resumed his seat upon the west counter. While McDonald was standing and abusing the defendant and his brothers, the evidence shows that the defendant advised Zachariah to shoot McDonald.

Alexander Woodworth says: "I heard loud talking in Wade's store, and saw Jim and Arch Allen come running out. Jim said he would see about that, using an oath. James went up to the harness shop. Jim, Zack and Nick all three came down on the sidewalk and started towards McDonald. They went about three or four steps—Zack first, James next, and Nick next. McDonald told them to stop. He stood in the door of the store and said: 'Zack, it's you I am talking to. * * * You have ruined my family, and I want you to keep away from me.' Jim said to Zack: 'Walk right down, you needn't be afraid; shoot,—shoot him.' Jim turned and said, 'I know where there is a double-barreled shot-gun.'"

Allen Milton says: "McDonald stood with one foot in Wade's store and the other outside, and had a knife and revolver in his hands. He raised his hands up and said: 'I want you to stop following me,' and cursed them. Wilsons stopped. McDonald said: 'I am talking to you now, Zack Wilson. You have damaged my family enough, and now you want to beat me up; but I won't be beat up by you.' James Wilson then said to Zack: 'Shoot him down, —— him; kill him, kill him. * * *' The Wilsons turned and went west; as they started, one of them said: "—— him, let's go and get a double-barreled shot-gun and shoot him.'"

Jesse Cain says, after describing the position of the parties: "Heard McDonald say '* * * I want you to keep away from me.' James Wilson said, '* * * let's go and get a shot-gun and kill him.'"

Wilborn Milton says: "* * * McDonald said they had injured his family and ruined his daughter; told them to keep away. Heard James say to Zack: 'Shoot him, shoot him.' James turned and went west and said: 'I know where there is a shot-gun, and I will get it.'"

There are other witnesses corroborative of these, but it is unnecessary at this place to repeat their testimony. Indeed, the defendant does not deny that he advised Zachariah to shoot McDonald, but claims that he thought it necessary for his self-defence.

After this scene both the defendant and Zachariah went in pursuit of arms. They stopped at Bagby's store. The defendant went in the room, Zachariah and Nicholas remaining at the door. The defendant there asked for Ben Griffin's shot-gun, and looked behind the door and in the back room for it. The defendant went then to Ben Griffin's residence, which was about eighty yards north from the north-west corner of the public square, and requested of him the loan of his shot-gun. Griffin informed him that he could have it, and that it was at Shafer's store. He then went to Shafer's store, got the gun and found there was no shot. He went to Miller's and purchased five cents worth of No. 1 shot. He proceeded to load the gun with these shot, and then sent a younger brother, Edwin, for caps. He brought G. D. caps. The defendant, with an oath, said he would not have G. D. caps, but must have water-proof caps, saying, I want something that will go. His brother effected the exchange of the caps he desired, and he then finished loading the gun. Having done this, he left the gun in Shafer's back room and started out to hunt Zachariah, whom, it seems, he found near the postoffice.

Zachariah, meanwhile, had made several ineffectual attempts to borrow a revolver,—in particular, once from Henry

Kneff, saying to him that he wanted to exchange shots with Tom McDonald, and once from Charles Wright—and he had also made an ineffectual effort to purchase cartridges for a revolver at Watte's, on the west side of the public square.

When the defendant found Zachariah near the post office, he and Arch Allen were sitting on the fence conversing with Charles Wright. The defendant called out to Zachariah to come along, saying that he had business enough for all of them—more than they could attend to;—this was about five minutes before the shooting. This is testified to by Wright and also by Ellis, the postmaster. They all, that is to say Zachariah and Allen, started south with the defendant. As they came by the door of Miller's store, Miller says he heard the defendant and Zachariah talking; that, as they started on south, he heard the defendant say to Zachariah, "I have got the shot-gun ready," or "the shot-gun is ready,"—and this is substantially corroborated by Pectold, who was standing at the time in front of Shafer's. When they arrived at Shafer's store, the defendant and Zachariah passed through the store into the back room where the gun was, remained a minute, then came back in the front room; then Zachariah went into the back room alone, picked up the gun, went out at a back door and passed thence on to the sidewalk in front of the store. As he got on the sidewalk, the witnesses describe him as first raising his head to look around, then dropping it and starting diagonally across to Wade's. The defendant, at this time, Mark Homes says, was watching the movements of Zachariah, and, as Zachariah started across towards Wade's, the defendant said to Homes, "Now, we will see some fun." When Zachariah had got about half way across, he changed the gun from his left hand to his right, cocked it, and carried it then with the breech under his right arm and the muzzle down by his right leg until he stepped on the sidewalk in front of Wade's. As he did this, he threw the barrel of the gun into his left hand, holding the gun at the lock with his right hand and with his eye fixed on Wade's door. He ad-

vanced until he had got directly in front of it, when he quickly drew the gun up, and, according to several of the witnesses, said: "Now, if you want anything out of me, lead out," and immediately snapped the right-hand barrel of the gun. He then seemed, momentarily, to give or shrink back on his left foot, and then straightened himself and instantly fired the other barrel of the gun. At the same moment with the discharge of this barrel, was the report of McDonald's pistol from within the store room. The evidence is unable to distinguish which of these reports was first. The overwhelming preponderance of the evidence shows, however, that Zachariah snapped the right-hand barrel before there was any pistol-shot fired, and, when Zachariah fired, the muzzle of his gun was either actually in or very near to the store door. His shot killed McDonald. McDonald's shot was wild,—entirely out of range of Zachariah, and downward.

With regard to McDonald's attitude when Zachariah approached and snapped the gun, there is but one witness aside from Zachariah,—Charles Cox, the clerk in the store. He seems to be entirely disinterested and without feeling, and describes clearly what transpired. He says: "I was in the store when the shooting took place; saw Zack coming across from Shafer's; first saw him through the east window, McDonald then sat on the west counter, a little over two-thirds of the way back, facing east. I was about five feet nearer the door than McDonald,—behind the west counter. Zack did not pass by the door after I first saw him. * * * I saw him get on the sidewalk about fifteen feet from the door and a little east of it; he then walked in a direct line towards the door. He came right to the door, presented the gun, snapped the cap, dodged back, then straightened himself immediately and fired. At the time the cap snapped McDonald still sat on the counter; as Zack raised the gun the first time, he jumped from the counter. At the time the gun fired, or almost at the same time, McDonald's revolver fired. I saw where the shot from the revolver went; * * *

it went to the left of the door where Zack was standing, some six or seven feet, and struck the west counter and passed downward to the left,—was apparently shot with a hand held as high as a man's head."

This evidence is not successfully contradicted. There is no pretence by any witness that McDonald was elsewhere than in the store room when he was shot,—no pretence by any witness entitled to credit that he was advancing upon or menacing Zachariah at that time.

The defence claim that Zachariah had reasonable grounds to suppose that he was in great danger of bodily harm from McDonald, and that, in shooting, he acted from the instincts of self-preservation, and not from motives of malice or revenge. This position is utterly unsustained by the evidence.

It is to be observed, in the first place, that the proof shows when McDonald came to Plymouth he went straight to Wade's, and never left there, staying most of the time inside the store. If he made threats of violence, he made not the slightest attempt to execute them. Even when the defendant, and his cousin, Arch Allen, were within a few feet of him, advancing as if in a hostile attitude, and were completely within his power, he inflicted no violence, and showed by his manner, as unmistakably as was possible, that he was acting only on the defensive, and wanted merely to be let alone. He is shown to have had a motive in going to Wade's. He had a sick family, and was in the constant habit of getting medicines there, and it was not a place that he ought to have anticipated he would probably meet with the defendant and his brothers, for they were not in the habit of resorting there. During the entire day up to the time McDonald was killed, no one other than McDonald is shown to have had any difficulty with the defendant and his brothers, or either of them. They were all over Plymouth hunting arms, and indicating bloody intentions by act and speech, and yet not a single human being is shown to have attempted to violently interfere with them. As has been seen, on Monday morning,

in Colmar, one of Zachariah's party, in his presence, if indeed it was not himself, declared that McDonald would receive violent injury on that day. When he was called from the hay-press by Nicholas, it was to inflict violence on McDonald. McDonald had then but just come to town, had given out no threats, had menaced no one, and the promptitude with which Nicholas informed Zachariah of his arrival, showed that he was expected—that they were waiting and watching for him. When Zachariah went to buy the cow-hide to use on McDonald, McDonald had not yet driven the defendant and Arch Allen out of Wade's, and had made use of no offensive language to Zachariah on that day When, by reason of McDonald's being armed, the cow-hiding was abandoned, the search for arms was to inflict vengeance, not for defensive purposes. Zachariah wanted of Kneff a good revolver to take a shot with McDonald. Had they not stood within shooting distance and heard all of McDonald's abuse, and passed away leisurely and without harm? No one pretends that McDonald or his friends was pursuing or following them up, and when McDonald was found, he had to be hunted up in his place of refuge, for such, to some extent, the proof shows it was, at Wade's. Then, the manner of Zachariah's approach shows, more strongly than any words can, that he was hunting his man. He cocked both barrels of his gun before he got across,—then, as he stepped on the sidewalk, he threw his gun in shooting position, and as he came, in this attitude, in front of his victim, he says, "Now, if you want anything out of me, lead out," and instantly pulls the trigger.

Why did he go to Wade's at all? He knew McDonald was there. The law does not allow a person to wilfully bring an attack upon himself for the purpose of getting an opportunity to kill his assailant, and then justify on the ground that he was acting only in his necessary self-defence. The pretence is made that Zachariah's object was only to get Nicholas, who was then in front of Metzger's, away and out of danger. But who was menacing Nicholas? No one. From whom had he

reason to anticipate injury?  No one, unless McDonald, and he had passed and repassed in front of the door of the room in which McDonald was sitting, in perfect safety.  The evidence shows clearly this is all pretence.

It will be recollected that when the defendant, having got and loaded the shot-gun, went to get Zachariah, he found him near the postoffice, at the north-east corner of the square. Now, the claim is, the defendant wanted to take Zachariah out of town, to the defendant's father-in-law's, and that Zachariah would not go and leave Nicholas, and that the gun was simply got to defend them on the road,—in short, that the hunt of arms, etc., was simply to protect a retreat out of town to a place of safety.  If this were true, how strange it is they did not keep together, and when they were once out of danger, why they did not stay out.  They were all together in front of Bagby's store, when the search for arms commenced, and when the defendant passed north from Shafer's, in search of Zachariah, Nicholas was on the same street, near the Rallston House, in easy hailing distance, and at a quarter of the town where it does not appear they were in any anticipation of danger, and the defendant and Zachariah either passed him or went part of the way in his company as they returned to Shafer's.

Ellis, the postmaster, says that at the time the defendant came up to Zack and told him to go with him, that they had business on hand, etc., he saw Nicholas standing on the sidewalk by the Rallston corner, and this, he says, was only about forty steps away.

James Miller says Nicholas was in his hardware store just before the shooting; and Casper Pectold says: "When Jim and Zack went into Shafer's, Nick went on across the street towards Metzger's."

Romine Smith says: "Saw James and Zack come back from the postoffice; saw Nick with them when they were over by Miller's."

Charles Wright says: "When Jim came up and called Zack, I saw Nick about 20 or 30 steps on the sidewalk behind him, standing near the corner of the Rallston House."

It is quite evident that Nicholas understood what was going to happen, and he passed on, leaving the defendant and Zachariah at Shafer's, to take position himself at Metzger's, where, in the language of the defendant, he could see "the fun," and, if necessary, lend a helping hand.

This subterfuge being disposed of, there is no purpose pretended for Zachariah's going to Wade's with the shot-gun, except to shoot McDonald.

The evidence quite clearly shows that, instead of McDonald being acting on the aggressive on Monday, he was agitated and alarmed, and was afraid to leave Wade's store. Thus, Charles Cox, the clerk in the drug store, says: "McDonald appeared very much excited after they (defendant and Allen) left, and very uneasy; kept watching the door; went and sat on a box by the front door five or ten minutes; then came in and stayed there until the shooting; he kept watching the front door and sometimes the back door."

Dr. W. D. Wade says, on cross-examination, after speaking of the occurrence of McDonald driving the defendant and Allen out of the drug store: "I went in the store with McDonald and had a conversation with him; told him he must go away from my store; if he wanted to have any fuss, he musn't fuss there; he did not go out of the store until they had all left; after that he went and sat on a box in front of the store a few minutes, and then went back into the store." * * * Again, he said, on re-examination: "When I told McDonald to leave my store, if he wanted to fuss, he replied: 'I am afraid to leave; they have got me surrounded; and I then told him he could stay in the store if he was afraid to leave."

Daniel Michaels, railroad agent, says: "After dinner I came up on the south side of the square; saw Thomas McDonald sitting on a box by the side of Wade's store door. I noticed that he was excited, and holding a revolver and knife. I said:

'Any trouble, Uncle Tom?' He replied: 'They are trying to run over me—to trample me down.' I asked: 'Who?' He said: 'The ——— Wilsons.'"

Romine Smith, on re-examination, says: "I told him [*i. e.* McDonald] that the Wilsons had threatened to kill him, and that they had gone to get a gun, and that he had better hide himself, or slip out. He said he couldn't get out. He then said: 'I will stay here if I have to die here.'"

But, conceding Zachariah's guilt, the defendant insists the evidence does not sufficiently connect him with it. On this point, too, we think the evidence overwhelmingly against the defendant. In the light of all the facts spread out before us in this record, it would seem there could hardly be a rational doubt that the defendant was at Plymouth on Monday, the 14th of August, 1876, for the express purpose of seeing his brother Zachariah revenged upon McDonald. His story that he was going to his father-in-law's, etc., we regard as of but little moment. The facts, his actions and the actions of his brothers, show that he was not going there. The proof does not show that he and Zachariah were together on Saturday, but it does show that he knew, on Saturday, that Zachariah and McDonald had had a personal difficulty of some character, on that day, in which McDonald was said to be the assailant. It is not expressly shown that the defendant and Zachariah had any communication in Plymouth before he and his cousin Allen were driven out of Wade's store by McDonald; but the circumstances irresistibly show that such was the fact, and that he knew when he went to Wade's that Zachariah and Nicholas had gone to Rallston's harness shop to get a rawhide with which to punish McDonald.

When Nicholas went to the hay-press and called Zachariah, he said, "Jim wants you," and we are justified in assuming this was true. We have before seen that Nicholas started to the hay-press for Zachariah, soon after he discovered that McDonald had come to town. Nicholas and Zachariah went from the hay-press direct to Bagby's store. The evidence shows

that defendant was there about that time. Samuel Wade says, as we have before observed, just after McDonald hitched his horse and came across to Wade's store, "I saw James Wilson up by Bagby's store." It is but reasonable to suppose, then, that defendant and Zachariah and Nicholas met there. For what? The sequel shows that just after that, Nicholas and Zachariah go to Rallston's to buy a raw-hide, and Zachariah informs us that was for McDonald. At or very near the same time, the defendant and Allen go to Wade's drug store, a place where Dr. Wade, the proprietor, says they were not in the habit of going or trading, pass by the clerk, the only man there in charge, without saying a word to him, and walk straight towards McDonald, and by their manner satisfy him, as we have a right to assume, that they mean violence to him. The defendant says they were only going to get something to drink. Then why eye McDonald and walk straight towards him, instead of stopping and making their business known to the clerk? There is no proof of such degree of familiarity and intimacy between the defendant and Dr. Wade as would have justified him in assuming that he might go in there and take liquor at his pleasure, without speaking to any one about it. When the defendant left the room at McDonald's instance, he did not have to stop to inquire where Zachariah was. He knew already, and ran directly to him in the harness shop. Here, then, is evidence of association, and of a common understanding, probably, that defendant and Allen should seize and hold McDonald while Zachariah and Nicholas entered and punished him with the cow-hide. This was what was at that time intended, as we infer from Zachariah's and Nicholas' declarations

But waiving this: after McDonald had brandished his pistol and knife on the street before the defendant and his brothers, and abused and threatened them, the defendant's own declarations show that he was in search of a shot-gun, not, as he subsequently pretended, with which to defend himself, but with which to punish McDonald. He was writhing under

what he regarded as a grievous insult and he wanted revenge. In addition to what has already been quoted, when he was in Bagby's store hunting for a shot-gun, William Jackson says he said: "He had been run out down there, and he be —— if he would be run out."

George Barker says the defendant said, after directing Zachariah to kill McDonald: "If there is a shot-gun in this town I am going to get it. I won't allow any G—d d——d man to draw a revolver on me."

Romine Smith says, after McDonald had cursed the defendant and his brothers on the street: "Jim turned and started west, and said, 'I will go and get a shot-gun and kill him.'"

The evidence, which we have heretofore quoted, shows that the defendant repeatedly said to Zachariah, "Shoot him, kill him," etc. And this is not denied, though attempted to be palliated by the defendant.

The naked facts of themselves that relate to the getting of the shot-gun, loading it, etc., and its use by Zachariah, show, incontestably, harmony and unity of design and action between Zachariah and the defendant. The defendant procured the shot-gun, loaded it so that it would kill; then went and got Zachariah, showed him where it was; went out on the sidewalk and stood, watching him go across the street to Wade's with the gun in his hands, remarking, "Now, we will see some fun." His location at Shafer's, and Nicholas' location at Metzger's, would enable them to intercept all aid to McDonald, and all interference with Zachariah that might approach from the streets.

While the defendant was procuring and loading the gun, a friend of his (one Yingling,) went to him and said, "Jim, you had better keep out of that fuss." He replied: "G—d d—— you, I don't want you to take any part against me. If you don't let me alone I'll knock you down,"—thus showing that he was desperately enlisted in it. Afterwards, however, upon Yingling saying that "I am talking to you for your own good," he said: "I am out of it, and I am going to stay

out of it." He had then procured and loaded the gun,—the balance—the using of it—remained for Zachariah.

It would seem impossible to make stronger and more complete proof of a conspiracy.

It is claimed, in argument, that the defendant and his brothers had reason to apprehend personal danger, not only from Thomas McDonald, but likewise from his brother, Newt. McDonald, and McDonald's friends, (Romine Smith, the Barkers, Wattes and Rallstons, and perhaps others) who, it is alleged, were there and armed.

As has been already observed, there is no proof that any of these persons, or any one else, uttered threats of violence, against the defendant and his brothers, or either of them, or that they offered to inflict such violence, before the killing of McDonald. Indeed, it is not pretended they made any effort to defend McDonald and save him from a violent death. The proof shows no one making threats against these parties, except Thomas McDonald, and that to have brought them within danger of his executing them, they had to go to Wade's where he was staying,—afraid to go away, lest he should be attacked.

Whatever may have been the vices and faults of McDonald, this record present no excuse for the taking of his life.

Where threats to take life are made, we have held, that before a party may attack or inflict bodily harm upon the person making the threats, there must be some overt act from which an intention may be reasonably inferred to carry into effect the threats, and the danger must be imminent. *Cummins* v. *Crawford,* 88 Ill. 312. There is some evidence (upon which, however, we place but little reliance, because of the improbability of its truth from the other evidence in the case) that, as Zachariah got in front of Wade's door, McDonald cried out to him to halt. Concede this to be true and that McDonald instantly attempted to kill Zachariah,—Zachariah went there to kill him. He is in no situation to claim that he is acting on the defensive. His act is dictated by

malice and a desire for revenge;—his peril is courted that he may have opportunity to gratify that malice and desire for revenge. All the authorities concur that in such case his act in killing is murder.

The defendant is clearly guilty, and any other verdict than that of guilty, on this evidence, would have been making a mockery and farce of justice.

Objection is urged that the court erred in admitting in evidence the testimony of Dr. Wade, that " I told McDonald to leave my store if he wanted a fuss. He replied, 'I am afraid to leave; they have me surrounded.' I then told him to stay in the store if he was afraid," etc. It is enough to say of this evidence the record does not show that it was objected to on the trial.

Another objection urged is, that the people asked Dr. Wade, and he answered, this question: " Will you tell the jury how you came to load your gun?" Answer: " I had an intimation that Zack was coming there to shoot McDonald, and I was loading my gun to protect my house." This, had it been introduced as original testimony, would doubtless have been objectionable. But the defendant drew out of the witness, on cross-examination, that he was loading his shotgun when Zachariah approached McDonald, necessarily with the view to raise some unfavorable inference against the witness, or some favorable inference in behalf of the defendant. Under these circumstances, we think, there was no impropriety in getting at the motive which controlled the act.

Objection is also urged, that Daniel Michaels said that McDonald said to him what we have before herein quoted in showing that McDonald was not acting on the aggressive. The record likewise fails to show that this evidence was objected to.

Objection is also urged against the like kind of evidence testified to by Romine Smith, but the record here again fails to show that it was objected to.

An objection is also urged that the court erred in allowing

Smith to state what Nicholas Wilson said to him in regard to the whipping of McDonald. To this, too, the record fails to show any objection was urged on the trial.

We think, notwithstanding the question is not properly before us, that inasmuch as the line of defence justified the shooting of McDonald as in the necessary self-defence of Zachariah, it was competent, in rebuttal of that theory, to show that McDonald was not aggressive, but, on the contrary, acting on the defensive, and hence that any of his declarations explanatory of accompanying acts were admissible as a part of the *res gestæ*. The declarations of Nicholas were admissible because the evidence, in our opinion, shows that he was at that time acting in concert with the defendant and Zachariah.

Objection is urged to declarations of Zachariah made on Saturday, to the effect that he would kill McDonald, etc. These declarations were inadmissible, and the ruling of the court thereon was erroneous. The proof does not show that a conspiracy existed, at that time, between the defendant and Zachariah, but it is not such error as will in the present case authorize a reversal. In the nature of things it did no harm. The conspiracy did exist on the following Monday, and Zachariah did then do, without any legal excuse or palliation, what these threats showed he intended to do. Disregarding these threats he is clearly guilty,—they do not make him more guilty than he would otherwise appear to be.

Zachariah's declaration to Romine Smith was clearly admissible, because the proof sufficiently shows that the conspiracy then existed. So, also, we think the declaration made by one of the party in Colmar, on Monday morning, was admissible, although that was drawn out on cross-examination, and of course was not objected to. The whole evidence furnishes proof that the defendant and his brothers were then making their way to Plymouth for a common purpose—having the injury or punishment of McDonald in contemplation, and the declaration of one was hence the declaration of all.

The evidence offered by the defendant and rejected by the

court was properly rejected. There was no foundation for
the pretence that Zachariah was acting in self-defence,—and
the evidence offered and rejected was wholly inconsequential.

Objection is urged to the giving and refusing of instruc-
tions. Without saying there was not any error in that
regard, we are contented that, as a whole, the case was fairly
given to the jury. There may have been some slight tech-
nical errors in this respect, and also in the ruling of the court
in regard to the admitting and excluding of evidence, which
we have not noticed. None of these, in our opinion, are of such
gravity as to require a reversal of this judgment. We have
endeavored to give to the record itself, not merely the printed
abstracts and arguments, but the transcript made up by the
clerk, a patient and thorough investigation; and we can come
to no other conclusion than that the defendant is rightly con-
victed,—under any correct ruling the verdict should have
been, and with an honest jury must have been, equally un-
favorable to the defendant. If any body has cause to com-
plain it is the people, not the defendant.

The State's attorney, we assume, without premeditation on his
part, but from impulse of the moment, was led into much intem-
perance of speech in his closing argument. This was entirely
unworthy of him as an officer of the law, and as a member
of an honorable profession. Had the attention of the pre-
siding judge been called to it at the time, he should have
been, and doubtless would have been checked and rebuked.
It does not appear that the judge's attention was called to this
language, and it can not, therefore, be said the court erred in
not checking him. In no event, however, should we regard
such an error as one that would authorize the reversal of a
judgment clearly right under the evidence.

Where the result reached by a judgment is clearly right, it
will never be reversed for errors which do not affect the sub-
stantial merits of the case. *Calhoun* v. *O'Neal,* 53 Ill. 354;
*Leach* v. *The People,* id. 311.

The judgment is affirmed.

*Judgment affirmed.*