# St. Louis, A. & T. H. R. R. Co. v. James Reagan, a Minor, who sues by his Father and Next Friend, James B. Reagan.

1. MINORS—*Suits by Next Friend—Bond for Costs.*—A court has power, upon a showing made, to allow a minor to prosecute a suit by his next friend, without such next friend giving a bond for costs.

2. MINORS—*Suits by Next Friend—Power of Court to Require Bond.*—A court is not required *sua sponte*, to compel the filing of the next friend's personal bond.

3. RAILROAD COMPANIES—*Right to Eject Trespassers from Trains.*—

St. L., A. & T. H. R. R. Co. v. Reagan.

A railroad company has no right to forcibly eject a person from its trains while in motion, because he is a trespasser thereon, and if such ejection is made in a wanton or willful manner, the company will be liable in exemplary damages. In such cases it is immaterial whether the relation of carrier and passenger does or does not exist.

4. COUNSEL—*Remarks of in Argument to the Jury.*—In order to assign for error improper remarks of counsel in arguments before the jury, objection must be made at the time. The question can not be raised by affidavit on the hearing of a motion for a new trial.

**Memorandum.**—Action for personal injuries. In the Circuit Court of Jackson County; the Hon. JOSEPH P. ROBARTS, Judge, presiding. Declaration in case; plea not guilty; trial by jury; verdict for plaintiff, $3,000, and judgment; appeal by defendant. Heard in this court at the August term, 1893, and affirmed. Opinion filed March 23, 1894.

The statement of facts is contained in the opinion of the court.

*Plaintiff's instructions, the giving of which is assigned for error:*

No. 1. If the jury believe, from the weight of the evidence, that James Reagan, the plaintiff, became a passenger on defendant's passenger train at the tank on defendant's railroad at Crab Orchard creek, on or about the 4th day of September, 1892, to be conveyed to Carbondale, and if you further believe that one Wisely, a brakeman in the employ of defendant's said passenger train, by force ejected plaintiff from said train while it was in motion, and while said plaintiff was on said train as aforesaid, and using due care for his personal safety as charged in the declaration, or any count thereof, then you should find the defendant guilty and assess the plaintiff's damages at whatever you believe from the evidence he has sustained, not exceeding, however, the sum of five thousand dollars ($5,000).

No. 2. If the jury believe, from the weight of the evidence, that James Reagan, the plaintiff in this suit, was on defendant's passenger train on defendant's railroad, on or about the 4th day of September, 1892, and that plaintiff, while using due care for his personal safety, was forcibly ejected from said train by the brakeman thereon employed on said train, while said train was in motion, as alleged in the declaration, or any count thereof, then the jury should find the defendant guilty, and assess the plaintiff's damages at whatever you find he has sustained by reason of injuries received thereby.

No. 3. The court further instructs the jury : If you find the defendant guilty, then, in assessing the plaintiff's damages, you should take into consideration the value of his time lost, if any is shown by the evidence, in consequence of his injuries, and a fair compensation for his physical pain and suffering and any permanent or continuing disability, if the evidence shows any as alleged.

No. 4. If, from the evidence, you find the defendant guilty, that in

assessing damages for injury, if the evidence shows any has been received by the plaintiff, you may consider the value of the time lost, if any is shown by the evidence, in consequence of the injury, and a fair compensation for his physical pain and suffering; and if the evidence shows that the plaintiff has received an injury, which is permanent, or likely to exist for a great while, you may give damages for the future as well as the present disability.

No. 5.  In determining the amount of damages which the plaintiff is entitled to recover in this case, if the jury find from the evidence, under the instructions of the court, he is entitled to recover any damages, the jury have a right to, and should take into consideration all the facts and circumstances in evidence before them; and they may consider the nature and extent of the plaintiff's injuries, if any, testified about by the witnesses in this case; his pain and suffering, if any, resulting from said injuries; the permanent disability, if any, caused by said injuries, and any future pain or suffering, or future inability to labor, if any, that the jury may believe from the evidence the plaintiff will sustain by reason of injuries received, not to exceed $5,000.

F. M. & D. V. YOUNGBLOOD, attorneys for appellant.

WILLIAM A. SCHWARTZ, attorney for appellee.

MR. JUSTICE SCOFIELD DELIVERED THE OPINION OF THE COURT.

This suit was commenced by James Reagan, a minor, by his father, James B. Reagan, as his next friend, without appointment of the latter as next friend by the court, and without the filing of a bond for costs.  Afterward appellant, the defendant in the court below, made a motion for an " order requiring the said James B. Reagan to give a good and sufficient bond for costs as required by the 18th section of the statute upon guardians and wards."  Appellee made a cross-motion, asking the court to appoint and allow James B. Reagan to prosecute the suit as next friend without giving bond for costs, and presented an affidavit in support of the cross-motion, showing that the minor had a meritorious cause of action, and that neither he nor his father was able to give a good and sufficient bond for costs. The court sustained the cross-motion and overruled appellant's motion.

Appellant concedes that it was within the discretion of

the court to allow the suit to be prosecuted by the ·next friend without security for costs. C. & I. R. R. Co. v. Lane, 30 Ill. App. 437; same v. same, 130 Ill. 116. But it is contended that it was the imperative duty of the court to require the next friend to file his personal bond for costs.

We do not agree with appellant's counsel in this construction of the law.

We think the court had the power, upon the showing made, to permit the suit to be prosecuted without the giving of any bond whatever. However this may be, we are satisfied that the court did not err in overruling appellant's motion. The court was called upon to dispose of the motion as formulated by appellant, and not of some other motion which might have been made. The motion was to require the next friend to give *a good and sufficient bond*, which could mean nothing else, in view of the next friend's insolvency, than a bond with security. It is admitted that the court had power to overrule such a motion. Appellant's motion being out of the way, the court was not required *sua sponte* to compel the filing of the next friend's personal bond, and the order of the court sustaining the cross-motion was in no manner prejudicial to appellant. We find no error in the rulings of the court on these motions.

It is next urged that the verdict is against the evidence, and particularly that the damages are excessive.

About two or three miles east of Carbondale, at the time of the accident, there was a tank at which trains were accustomed to take water. While there was no ticket office at the tank, the right of the traveling public to take or leave the train at that point was recognized by the company. The fare to Carbondale was seven cents.

Nine hundred and forty feet west of the tank, the railroad passed over Crab Orchard creek on a trestle, which was from forty-five to fifty feet high. On the south side of the track, and but a few feet east of the trestle, was a white oak post set in the side of the grade so that the top of the post was on a level with, and about three feet from, the south rail of

the track. Attached to this post were barbed wires, which ran thence under the trestle.

The roadbed near the post was graded to a height of four feet, and was barely as wide at the top as a passenger coach. The track from the tank to the trestle was straight and comparatively smooth.

At 2:30 in the afternoon of September 4, 1892, James Reagan, who was eighteen years of age on that day, went upon the rear platform of the rear coach of a west bound passenger train, which had stopped at the tank for water. He sat down upon the platform, with his feet on the steps and his face toward the south, and was sitting thus, without holding to any part of the car for support, when the accident occurred.

When the train approached the white oak post near the trestle, it was running at the rate of thirty miles an hour, according to the testimony of the brakeman, Wisely. Four young men, Childers, Meyers and the two Robinsons, who were standing near the tank, with their view of the train unobstructed, saw a man, who proved to be the brakeman, come out of the rear of the coach, and lay his hand on Reagan's shoulder. Almost immediately thereafter, Reagan fell from the car. The brakeman went into the car and the train rolled onward to Carbondale. Wisely swears that as soon as the man went off, he pulled the bell rope, and that, having received no answer, he ran through the train and told the conductor. The conductor swears that he was so near Carbondale when he learned of the accident that he concluded to go on and make his connection with the Illinois Central. He stopped the train at the junction to register, he threw two switches, he ran to the depot, which was half a mile from appellant's road, and then sent the brakeman back to take care of the injured man.

In the meantime, the young men above mentioned, with Norbury, who had charge of the tank, but had not witnessed the tragedy, ran from the tank to the place where Reagan lay. The injured man's head had struck the post. Some of the barbed wire was wrapped around him. He

was bruised and cut in several places. He was unconscious and remained so till next day. He was taken to the home of his uncle; and when the brakeman arrived at the scene of the accident, it was to find that Reagan had received more timely assistance.

The brakeman swears that he went back to take up the slack in the bell rope; that he found a stranger on the platform and inquired where he was going; that he understood the man to answer Bethel or Belleville, and · then advised him to get inside; that the man said he had no ticket—also that he had no money; that he (the brakeman) then told the stranger that he ought to have gotten off before the train got to going so fast; that thereupon the man jumped from the car, holding on with his right hand, and was dragged thirty or forty feet; that the train "jerked him, and his heels went up, and he swung around sideways;" and that he "hit the ground thirty or forty feet before he got to the trestle."

Reagan swears that he had fifteen cents in his pocket, and was ready and willing to pay his fare; that the fare was not demanded; that he did not know the brakeman was there till he felt a hand on his shoulder; that the brakeman asked where appellee was going; that appellee answered "Carbondale;" that the brakeman said, "you had better get inside of the car;" that appellee answered that he was faring very well where he was sitting; that the brakeman put his foot or knee in the small of appellee's back and shoved him off; that appellee "went over just like a wheel, head first," and that his injuries were so serious as to render him unconscious until some time during the following day.

Life is certainly of more value than seven cents. If the brakeman shoved Reagan from the platform at this dangerous place, with the train running at a high rate of speed, the company is liable, even though Reagan was a trespasser. The brakeman knew the probable dangerous consequences of his act, for when he was asked if he got off the train when Reagan did, he answered that he did not, that he was not ready to die.

What is the fact ?    It is said to be beyond belief that the brakeman should have committed so fiendish a deed.    Equally incredible is the other theory that Reagan jumped from the car.    The question of a pure accident by falling is not presented, for of the two actors who know the absolute truth, one says Reagan jumped off, and the other says he was shoved off.    What necessity was there for Reagan to incur the risk of jumping from the train ?    A rational being in his position would have had no fear of being hurled from a rapidly moving train for the non-payment of seven cents. The most serious calamity he could have anticipated would be the stopping of the train and ejection therefrom without danger to his person.

In any view of the case it is fully as incredible to assert that Reagan jumped from the train as it is to affirm that the brakeman shoved him from the train.

The young men who stood near the tank and witnessed the accident, saw the brakeman lay his hand on Reagan's shoulder.    One of them says that the brakeman held to the railing at the end of the car with the other hand.    This looks as if the gentleman was bracing himself for the application of force to the offender.    The young men did not see a kick or a shove.    Some of them think they would have seen a kick if force had been applied in that manner.    They all swear, however, that Reagan might have been shoved without their cognizance of the act.

One of them swears, without objection, that he has a suspicion that Reagan was shoved off.    While this is not proper evidence, it does have a tendency to show that the facts, as they appeared to the witness, were not inconsistent with the theory that Reagan was shoved from the train.

The following statement occurs in the testimony of the brakeman, as set forth in the abstract :

" I then told him he ought to have gotten off before the train got to going so fast."

Was the brakeman insisting that Reagan should get off ? And was Reagan pleading that the train was going too fast ? And was the brakeman urging that that was not a sufficient

excuse—that he should have gotten off sooner? Did the brakeman take Reagan for a tramp, who might be dealt with in a summary manner without fear of the consequences? He swears that there had been no trouble with tramps on that day, but admits that he might have said something about tramps on the former trial of this case. He does not deny that he regarded this man as a tramp.

All of the young men who witnessed the accident say that Reagan went directly forward from the platform.

There was no raising as if to jump. Childers and William Robinson say he went off with his head down. Does a man *dive* when he undertakes to jump from a rapidly moving train? Meyers says he went off head first—a summersault. Does a man practice turning summersaults under such unfavorable circumstances?

We can not readily understand how one sitting on the platform of a car, with his feet on the steps, could jump from the train without some preparatory movement.

The evidence shows clearly that no such movement was made.

We think the jury were justified in finding that the brakeman shoved or pushed Reagan from the train. This being true, there is no difficulty in disposing of the question of damages. The act of the brakeman was certainly wanton, willful and malicious. The jury were justified in giving exemplary as well as actual damages. In this view of the case the damages are not excessive. In fact, it appears from the testimony of this young man and his physician that the former has probably sustained permanent injuries such as will interfere materially with his ability to earn a livelihood by manual labor, which is his only means of support. We find no error in the assessment of damages.

We come now to a consideration of the instructions. Five were given for appellee. It is admitted that the fourth is free from error. All instructions asked by appellant were given without modification.

It is urged that appellee's first instruction is erroneous in submitting to the jury the question whether or not appellee

was a passenger. The first instruction given for appellant submits the same question to the jury and also defines the word passenger, and appellant is therefore estopped from saying that this was not a proper question for the consideration of the jury. Besides, appellee's instruction requires, as indispensable to a recovery, that the jury find from the evidence a forcible ejection of appellee from the train, while in motion, by appellant's brakeman. In such case it was immaterial whether the relation of carrier and passenger did or did not exist, as is admitted by appellant's first, fourth and fifth instructions.

It is also urged that the instruction is erroneous in stating to the jury that if they find the facts to be as supposed in the instruction, they *should* find for appellee. In such case we think the jury have no discretion in the premises. When the plaintiff proves all the facts necessary to entitle him to recover, it is the duty of the jury to find in his favor.

The foregoing remarks dispose of the principal objections to the second instruction. While the measure of damages is not stated in this instruction, it is stated in the third, fourth and fifth instruction.

It is not necessary, nay, it is hardly possible, to cover the whole case with one instruction.

The criticism on the third instruction is as follows : " The third instruction is erroneous because it tells the jury that if they find the defendant guilty, in assessing the plaintiff's damages they should take into consideration certain facts. This word *should* is tantamount to *must*, and should not have been used." According to this proposition if the evidence shows loss of time in consequence of the injuries received, and physical pain and suffering and permanent disability in consequence of the same injuries, the jury may or may not consider these facts in the assessment of damages. Surely this is not the law.

The fifth instruction is criticised, because it tells the jury that in the opinion of the court, the plaintiff is entitled to some damages. We do not so understand the language. Let the objectionable clause speak for itself. It is as fol-

lows :  " In determining the amount of damages which the plaintiff is entitled to recover in this case, if the jury find from the evidence, under the instructions of the court, he is entitled to recover any damages, the jury have a right to, and should take into consideration all the facts and circumstances in evidence before them."

The next criticism is in the use of the word *about* in the following clause : " They (the jury) may consider the nature and extent of the plaintiff's injuries, if any, testified about by the witnesses in this case."   The clause means no more than that the jury may consider the nature and extent of the plaintiff's injuries, if any, concerning which the witnesses have testified.   The instruction does not authorize the jury to go beyond the evidence, but expressly requires their findings to be based upon the evidence.

We find no substantial objection to any of the instructions in this case.

Finally, it is alleged that appellee's attorney abused appellant in the closing argument to the jury.   It is admitted, however, that appellant made no objection at the time, but sought to raise the question by affidavit on the hearing of the motion for a new trial.   This can not be done.   The speech, if objectionable, should have been objected to at the time when it was delivered.   Wilson v. The People, 94 Ill. 299; Campbell v. The People, 109 Ill. 565; Chicago City Railway Co. v. Duffin, 24 Ill. App. 28.

It may be observed also, that the trial judge does not certify that the speech in question was made.   He simply certifies that on the motion for a new trial, an affidavit was filed affirming that such a speech was made.

The judgment of the Circuit Court is affirmed.