Henry Lilly

*v.*

The People of the State of Illinois.

*Filed at Mt. Vernon January 16, 1894.*

1. CRIMINAL LAW—INSANITY AS A DEFENSE—*evidence on the subject—from acts, etc.* In a prosecution of one for an assault with intent to murder, where the defense is insanity, the failure of the People to ask any direct question as to the defendant's sanity will not defeat a conviction, when the acts and conduct of the defendant prior to and at the time of the assault tend to prove that he was perfectly rational, and that he acted from motives of revenge, and not in obedience to an uncontrollable impulse. So his sanity may be shown by what he may say and do after the offense.

2. On the trial of a husband for an assault on his wife with intent to murder her, it appeared that the defendant, shortly after the assault, wrote his wife a letter, expressing sorrow for what he had done and seeking a reconciliation, and intimating danger if she testified, and that she received also two other letters, signed "A Friend," which sought to deter her from appearing as a witness in the prosecution: *Held*, that while there was no direct evidence that the defendant wrote the two last letters, the inference was strong that he inspired them. But whether he did or not, the first showed clearly that he appreciated the criminal character of his act, and was striving to avoid punishment by escaping his wife's testimony, by intimidation.

3. SAME—*when insanity an excuse for crime.* The settled rule in this State is, that when insanity is relied on to excuse an act otherwise

criminal, whenever it appears, from the evidence, that at the time of doing the act charged the prisoner was not of sound mind, but affected with insanity, and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. But this unsoundness of mind must be of such a degree as to create an uncontrollable impulse to do the act charged, by over-riding the reason and judgment, and obliterating the sense of right as to the particular act done, and depriving the accused of the power of choosing between them.

4. In this case the evidence, facts and circumstances are given, which failed to overcome the presumption of the sanity of the defendant to the extent of raising a reasonable doubt on the subject, and especially so in the light of the evidence offered by the prosecution.

5. SAME—*instructions as to defense of insanity.* In a criminal prosecution in which insanity was the defense, the jury were instructed that the insanity need not be established by a preponderance of evidence, but if, upon the whole evidence, they entertained a reasonable doubt as to the sanity of the accused, they should acquit him. Another instruction announced the rule that if there was sufficient evidence to rebut the presumption of sanity, or raise a reasonable doubt, the burden was cast upon the People to show by evidence, beyond a reasonable doubt, that the defendant was sane at the time of the alleged offense: *Held,* that these instructions covered the law of the case.

6. SAME—*presumption arising from defendant's acts.* An instruction given on a prosecution of one for an assault with intent to commit murder, told the jury that the law presumes every sane man intends the natural, usual and probable effect of his willful acts, and then told them that if they found, from the evidence, that the defendant made the assault as charged, and that the natural or probable effect thereof might have resulted in the death of the party assaulted, the law would presume that he intended the consequences of his act: *Held,* to announce a correct rule of law.

7. INSTRUCTIONS—*not necessary to state whole law in each.* In giving instructions to the jury it is not necessary that each should contain the whole law of the case, or call the attention of the jury to all the contentions of the respective parties to the suit. It is sufficient if the series of instructions, considered as a whole, fully and fairly announce the matters of law applicable to the theory of the prosecution and defense.

8. NEW TRIAL—*newly discovered evidence merely cumulative.* A new trial will not be granted on the ground of newly discovered evidence when the new evidence is merely cumulative and by no means conclusive, and no proper excuse is shown for the failure to produce it on the trial.

WRIT OF ERROR to the Circuit Court of Fayette county; the Hon. JESSE J. PHILLIPS, Judge, presiding.

Messrs. HENRY & GREEN, for the plaintiff in error:

Where evidence is offered which tends to show that the defendant was insane at the time of the crime charged, the burden of showing sanity is cast upon the prosecution. *Dacey* v. *People,* 116 Ill. 555; *Montag* v. *People,* 141 id. 75.

The court erred in its rulings on the instructions given and refused. Sanity is an ingredient in crime as essential as the overt act, and if it is wanting there can be no crime, and if the jury entertain a reasonable doubt on the question, the prisoner will be entitled to the benefit of that doubt. 31 Ill. 385.

A motion for a new trial may be made at any time during the term of the court at which the judgment is entered. Starr & Curtis' Stat. chap. 110, sec. 57; Thompson on New Trials, sec. 2727; *Campbell* v. *Conover,* 26 Ill. 64.

The court erred in overruling the motion for a new trial, based upon newly discovered evidence. The rule of *laches* and diligence does not apply where the defense is insanity, and where the evidence introduced tends to show it. The additional evidence in this case is not merely cumulative, but is of such volume and character that the court can well conclude that had it been present and used on the trial below the verdict would, in all reasonable probability, have been different, and on a new trial would result in an acquittal. When that is the case, the newly discovered evidence is not merely cumulative, though it may be of the same character. *Monroe* v. *Snow,* 131 Ill. 126; *Champion* v. *Ulmer,* 70 id. 322; *Wood* v. *Echternach,* 65 id. 149; *Sulzer* v. *Yott,* 57 id. 164; *Hayes* v. *Houston,* 86 id. 487; *Bulliner* v. *People,* 95 id. 394; *Hupp* v. *McInturff,* 4 Bradw. 449.

Mr. M. T. MOLONEY, Attorney General, for the People:

When insanity is set up as a defense, before the accused can be acquitted on that ground it must appear, from the

evidence, that at the time of the commission of the offense he was not of sound mind, but was affected with insanity to such a degree as to create an uncontrollable impulse to do the act charged, by overriding his judgment and reason. *Dacey* v. *People*, 116 Ill. 556; *Montag* v. *People*, 141 id. 75.

It was not for the People to make mention of the defense (insanity) of the accused in the instructions named. The sixth instruction fully states the law upon this question.

The refused instructions, Nos. 5, 6, etc., do not accurately state the law, and even if they did, there was no error in refusing them. The jury was very fully instructed upon the question of insanity, and it may be said there was no legal evidence upon the subject.

The newly discovered evidence upon which the new trial was asked is merely cumulative. All of it is upon the one question,—the defense of insanity,—and incompetent, or at least very weak, at that. If introduced upon the trial it could not have changed the result.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

This is a writ of error to the circuit court of Fayette county, to reverse a judgment of conviction, at its last February term, against plaintiff in error, for the crime of an assault with intent to commit murder. It was proved by the prosecution, and not denied by the defendant, that on the 31st day of December, A. D. 1892, he was married to the prosecuting witness in the city of Peoria, where he lived with her about two months, when they separated. During the time they lived together, and shortly after their separation, he was guilty of repeated acts of cruelty toward her, and more than once threatened to take her life. About the first of March he left Peoria and went to Vandalia, where his mother and a sister resided. On the 6th of that month he sent a telegram to his wife, in Peoria, signed "Dr. Green," saying, "Harry has brain fever and is not expected to live." In answer to that message she arrived

in Vandalia on the evening of the 7th, but learning there was no such person in that city as Dr. Green, she immediately arranged to return to Peoria. The next morning the defendant called upon her at her hotel and requested her to go home with him, but she refused to do so. He then asked her what she intended to do, and she told him she was going back to Peoria. He asked her when she was going, and she said that evening. She testified that he then said: "If you do go back you will see me again. I doubt whether you will go back or not." The parties met no more until she was going to the depot for the purpose of taking the train to Peoria, when, as she testified, "as I came around the corner of the depot I met him face to face, and he said, 'And so you are going away, are you?' and as I was going to answer yes, he struck me." The blow was struck with a knife, inflicting a severe wound in the face. Her evidence is: "I dodged down when he went to strike me with his knife. The knife ripped my cheek open, and it cut clear through to the bone into the mouth." After her return to Peoria she was in hospital, under treatment, some two weeks.

It was not denied, upon the trial, and is not now, that the assault was made as described by the prosecuting witness, nor that the facts and circumstances attending it, as detailed by her, *prima facie* made out the crime charged in the indictment. It was, however, insisted, that the defendant was at the time so affected with insanity as to be irresponsible for his acts.

The grounds of reversal urged are, the verdict was not warranted by the evidence, the trial court erred in giving and refusing instructions, and in refusing to grant the defendant a new trial because of newly discovered evidence.

In discussing the first point counsel say: "The only evidence introduced on the question of the insanity of plaintiff in error was that introduced by him. The People did not offer any evidence on that question." If by this, counsel mean to be understood as saying that the prosecution asked no witness

the direct question as to the defendant's sanity, this statement is true; but it can scarcely be seriously contended that the foregoing testimony of the wife, as to his actions toward her, prior to and at the time of the assault, does not tend to prove that he was perfectly rational, and that he acted from motives of revenge, and not in obedience to an uncontrollable impulse. But what he did and said after the assault, as testified to by the People's witnesses, shows that he was sane. After he committed the crime he went to the county jail and surrendered himself. He there admitted the assault, and talked about the time he would get in the penitentiary, and said "he thought he wouldn't get over seven years." Prior to his preliminary examination, which was held the next day, he gave a witness a written communication, with the request that he should hand it to his wife. That communication was offered in evidence on the trial, and is as follows:

"*Dear Allie*—I am very sorry that this has happened, but it can not be helped now. I think the best thing for us both is, to make up and let everything of the past pass. You know I told you I did not want to give you up. Now, Allie, I do not want to make you feel bad, but I am afraid my divorced wife will cause trouble about the perjury in the divorce case. Of course, I will be awful glad to make up, as I told you a dozen times before. All the harm I wish you is you will get well in a few days, and not have any trouble. That is all the bad luck I wish you. So, good-by. .     H. LILLY."

After the wife returned to Peoria she received two letters, as follows:

"*Mrs. Lilly.*                    "ST. LOUIS, Mo., *March 10, 1893.*

"DEAR MADAM—You had better leave Peoria for a month or two, as there is a warrant sworn out for your arrest for perjury at the last term of court. I came from Vandalia this morning.

"Yours, respectfully.                    A FRIEND."

"*Mrs. Lilly, Peoria:*  "ST. LOUIS, Mo., *March 10, 1893.*

"DEAR MADAM—The father of wife No. 1 has been investigating the matter concerning how Mr. Lilly got his divorce, and has found out you perjured yourself, and is waiting for you to come down for court. If you don't come he will send after you. I would advise you to leave Peoria very quietly, for a month or two, at least.  A FRIEND."

While the evidence does not directly show that the last two were written by the defendant, when considered in connection with the first, in the absence of all proof to the contrary, the inference is strong that he inspired, if he did not in fact write, them. But whether he did or not, the first clearly shows that he fully appreciated the criminal character of his act, and was striving to avoid punishment by escaping the force of his wife's testimony, by intimidation.

It has long been the settled rule in this State, that where insanity is relied upon to excuse an act otherwise criminal, whenever it appears from the evidence that at the time of doing the act charged the prisoner was not of sound mind, but affected with insanity, and such affection was the efficient cause of the act, and that he would not have done the act but for that affection, he ought to be acquitted. But this unsoundness of mind or affection of insanity must be of such a degree as to create an uncontrollable impulse to do the act charged, by overriding the reason and judgment, and obliterating the sense of right as to the particular act done, and depriving the accused of the power of choosing between them. *Hopps* v. *The People*, 31 Ill. 385; *Dunn* v. *The People*, 109 id. 635; *Dacey* v. *The People*, 116 id. 555.

Tested by this rule, the evidence offered by the People not only tended to prove the sanity of the defendant at the time he made the assault, but *prima facie* established the fact. Did the evidence introduced on behalf of the defendant disprove

the fact to the extent of raising a reasonable doubt of his criminal responsibility?

Two witnesses from Peoria, who had worked with the defendant in that city at the barber's trade, and who had known him about one year, were introduced. While they say they considered him of unsound mind, when they come to state the facts upon which that opinion is based it clearly appears that all they mean to say is, that his conduct was at times peculiar; that he was nervous, and, especially when talking about trouble with his wife, became greatly excited. Shortly before leaving Peoria he took an over-dose of morphine and was sent to a hospital, where he remained for some days. These witnesses visited him while there, and say he talked and acted strangely, and yet there is nothing in his conversation or conduct, as detailed by them, indicating a disease of the mind. He was then recovering from the effects of the drug, and was, as they say, very nervous. Neither of these witnesses says he did not know right from wrong, or that he did not at all times have complete control over his actions. On the contrary, they both show that he pursued his daily avocation as men generally do, and although he sometimes talked foolishly, he was not treated, either by the witnesses or others, as insane. Most, if not all, of his peculiar conduct, especially his cruel treatment of his wife, was the result of her refusing to comply with his wishes, and finally refusing to live with him. In other words, he was actuated by a motive, which, however reprehensible, was not inconsistent with sanity.

The city marshal of Vandalia testified that he met the defendant on the day of the assault, at the post-office, and told him his wife was in the city; that he denied that he had a wife, and hurried out of the office. This witness states: "He looked to me that morning like he was off of his base. I mean by that, that he did not look right; looked to me like wild—crazy. I heard him say down at the jail, 'I did not know what I was doing when I done it,—I was crazy.' I heard him

talk several times in the barber shop previous to the cutting. He asked how a fellow felt when he was going crazy. That was several days before the cutting. He said, 'I feel like going crazy.' Then he would get up and go out, and pretty soon come back again. When talking he would say, 'Do you see! see! see! see!'—something like that. I had known him a good while. He was worse this time than previous, but I always did think him a little crazy,—something was wrong with him. He seemed to be very nervous when I told him about his wife. He hurried right off, and that was the last I saw of him until somebody said he had cut his wife. He turned white when I told him, and seemed to me like he was wild. His eyes glared out just like some fellow that was very much excited, or something. I don't know what made it. I don't know that I noticed any unusual stare. I don't think I ever saw Lilly drunk in my life. He don't drink much. I think it was two or three days before the cutting that he spoke to me about his head."

We regard this testimony as much more convincing that he entertained a feeling of malignancy toward his wife than that he was insane, especially to the extent of not knowing right from wrong, or being the unwilling instrument of an uncontrollable impulse. As a general rule, insane persons do not admit their insanity, or make it the subject of conversation; nor does the fact that one becomes greatly excited upon a particular subject prove insanity.

The police magistrate of the city of Vandalia was the only other witness introduced upon the trial whose testimony can be said to have tended to prove the defendant's unsoundness of mind. He saw him the next morning after the assault, at the preliminary examination. Upon his examination in chief the witness said: "He looked rather strange out of his eyes. I don't think he looked right. He was excited and nervous. In my opinion he was not right in his head." On cross-examination he testified: "I never made a study of insanity.

Had known Lilly six or seven years. My acquaintance with him was just a passing acquaintance. I got shaved in his shop,—not often, though. I always did think he was what might be called a 'crank.' He did not act like a man of sound mind. He claimed to be a detective. He talked about large rewards he was going to get. Don't know what else I observed, but I never did think he was right ever since I knew him. I suppose he did business like everyone else. He ran a barber shop here, and conducted himself properly at this place. All the reason I can give for thinking him crazy was his appearance and actions. Every time he would get where excitement was he would look wild out of his eyes and talk wild. At the trial he talked rational and acted rational. He looked wild out of his eyes. I can't describe that look. I think Lilly knows right from wrong."

After a careful examination of this testimony we are clearly of the opinion that it wholly fails to overcome the presumption of sanity to the extent of raising a reasonable doubt on that subject, and especially so in the light of the evidence offered by the prosecution. To hold that upon the proofs in this record the jury should have acquitted the prisoner upon the ground of insanity, would be contrary to reason and authority, and most dangerous to the public.

A general objection is urged against the first five instructions given for the People, in that they each fail to call the attention of the jury to the defense of insanity, and authorize a verdict of guilty without requiring the belief, beyond a reasonable doubt, that the defendant was, at the time of the commission of the act, of sound mind. This criticism is especially made upon the third instruction, only a part of which is quoted in the argument. It first tells the jury that the law presumes every *sane* man intends the natural, usual and probable effect of his *willful* acts, and then says, if they find, from the evidence, that the defendant made the assault as charged, and that the natural or probable effects thereof might result

in killing Allie Lilly, the law would presume that he intended the consequences of his act. When the whole instruction is considered it announces a correct rule of law applicable to the case. It is well understood that in giving instructions to a jury it is not necessary that each should contain the whole law of the case, or call the attention of the jury to the contentions of the respective parties to the action. It is sufficient if the series of instructions, considered as a whole, fully and fairly announce the rules of law applicable to the theory of the prosecution and defense.

In the first instruction given on behalf of the defendant, his rights under the plea of insanity are clearly and definitely set forth. In the second the jury were told that the insanity need not be established by a preponderance of evidence, but if, upon the whole evidence, the jury entertain a reasonable doubt as to the sanity of the accused, they must acquit him. The third announced the rule, that if there was sufficient evidence to rebut the presumption of sanity to raise a reasonable doubt, the burthen is cast upon the People to show by evidence, beyond a reasonable doubt, that the defendant was sane at the time of the alleged offense. These instructions covered the law applicable to the defense of insanity, and are in no way inconsistent with those given at the request of the prosecution.

Other instructions asked by counsel for the defendant, and refused, in so far as they correctly stated the law, were included in those given. We find no error in the giving or refusing of instructions.

The last assignment of error insisted upon is the refusal of the trial court to grant a new trial on the ground of newly discovered evidence. Two motions for that purpose were filed, the first being presented upon the coming in of the verdict, which was April 15, in support of which certain affidavits were filed. It was overruled, and judgment entered upon the verdict, the defendant being sentenced to the penitentiary for a

term of ten years. About a month later, after the defendant had been taken to the penitentiary, but during the same term of court, a second motion seems to have been presented, and additional affidavits of newly discovered evidence filed, asking that the judgment be set aside and a new trial granted. That motion was also denied.

Without reference to the irregular practice pursued, we are of the opinion that both motions were properly overruled. The newly discovered testimony, as shown by the affidavits, all goes to the question of the defendant's sanity, and is of the same character as that introduced at the trial on that subject, viz., the opinions of non-expert witnesses, proving no more than that he was eccentric, excitable, nervous, etc. It is, at most, merely cumulative, and by no means conclusive. Moreover, no legal excuse is shown for the failure to produce it upon the trial. Counsel who were employed to defend, and who appeared at the trial, as shown by their own affidavits, were fully informed of the nature of the defense, and must have known where the evidence in support of it was to be found, if it existed. Three witnesses were subpœnaed from Peoria, but only two appeared at the trial. The third, a physician, failed to answer, and no attempt was made to compel his attendance or to postpone the trial on account of his absence. The mother and sister of the accused, whose affidavits were afterward presented, resided in Vandalia, where the trial was had, and no reason is shown why they were not put upon the witness stand, if their evidence is to be regarded as material. In short, so far as the record discloses, the trial was voluntarily entered upon, with little or no preparation therefor, if the evidence relied upon on the motions for a new trial is of the convincing character now claimed for it. To hold that trial courts should set aside verdicts, and even judgments, and re-try cases on newly discovered evidence, under the circumstances disclosed by this record, would be to permit parties to experiment upon the result of trials and trifle with

the court. Surely, some degree of diligence must be required of counsel employed to defend parties accused of crime, no matter what may be the nature of the defense, in order to entitle the defendant to a new trial because of subsequently discovered evidence. But, as before stated, if the witnesses whose affidavits are in this record had been present at the trial, and testified, their testimony would have been but corroborative of that of those who were introduced, and, in our opinion, would have failed to make out the defense. It is, to say the least, remarkable that no medical witness was found, either before or after the trial, who would testify to the insanity of the defendant, although he was for a time in hospital in Peoria, and was more or less generally known, both there and in Vandalia.

We think this record free from substantial error, and the judgment of the circuit court will be affirmed.

*Judgment affirmed.*

Mr. Justice Phillips, having heard this case in the circuit court, took no part in its consideration or decision here.