(No. 30472.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES RILEY HUBBS, Plaintiff in Error.

*Opinion filed November 18, 1948—Rehearing denied Jan. 17 1949.*

Rumsey & Dennis, of Harrisburg, and Thomas H. Daily, of Shawneetown, for plaintiff in error.

George F. Barrett, Attorney General, of Springfield, and Robert H. Davis, State's Attorney, of Shawneetown, (James W. Karber, and Joseph L. Bartley, both of Shawneetown, of counsel,) for the People.

Mr. Justice Gunn delivered the opinion of the court:

Charles Riley Hubbs, referred to herein as defendant, was indicted in the circuit court of Gallatin County for the murder of Floyd Barnes. On a trial by jury he was found guilty and his punishment fixed at imprisonment in the penitentiary for life. Motions for a new trial and in arrest of judgment were overruled. Judgment was entered on the verdict. Defendant has sued a writ of error out of this court and contends that the judgment should be reversed for the reason that his rights were prejudiced by the admission of certain evidence offered on behalf of the People; that the evidence does not support the verdict

and that there was error in the giving and refusal of instructions.

Defendant, aged 52, and his mother resided on a farm which was located in the same neighborhood where Barnes and his family resided. Defendant leased certain fields on his farm to Barnes for the year 1946 which were planted with corn. The rental was on a share-of-the-crop basis. There is a conflict in the evidence as to whether there was any trouble preceding the shooting. He had been on friendly relations with Barnes for many years. Except for the possibility of words passing between them within the week preceding the killing there had been no difficulties during the years.

It is conceded that on the morning of December 25, 1946, defendant fired a shotgun at Barnes, the load taking effect in the upper right quadrant of his abdomen, and that he died within three or four hours from the effects of the wound. The defense interposed was that the shooting was done in self-defense.

On the morning the tragedy occurred, December 25, 1946, Barnes, his two sons, Harry, aged 11, and John, aged 14, and a neighbor boy, Charles Lackey, aged 15, went to defendant's farm to husk corn on land leased by Barnes. They had two wagons. Barnes and Harry husked in one wagon and John and Lackey in the other. Shortly before 9 o'clock that morning, they went to the cribs near defendant's house to unload and divide the corn which they had husked that morning. There is a conflict in the evidence as to whether defendant came to the crib in answer to a request of Barnes or whether he came on his own motion. Defendant testified that a prior dispute in reference to the division of the corn was renewed, he claiming he was to have two fifths and Barnes contending he was to have one third. One of the Barnes boys and Lackey testified that the corn was divided amicably and that no words passed between the defendant and Barnes. There is no

evidence of any threats having been made by either party at that time. Defendant's evidence is that the controversy involved not to exceed 100 bushels of corn.

After the corn was unloaded, Barnes and his son Harry went to one field to husk some short rows which were in a corner field bordered by an open ditch. John and Lackey went to a field east of the ditch across from where Barnes and Harry were husking. About the time deceased left the cribs or shortly thereafter, defendant went to the ditch dividing the field, carrying a shotgun. He claims he went to examine some traps, one of which was in the ditch near where Barnes and Harry were husking. John and the Lackey boy had husked once across the field and were turning back, thus placing them about 100 yards from the ditch where defendant was examining his trap. Harry Barnes testified that he and his father worked east past the place where defendant was in the ditch. It was near the end of the rows and they stopped their team headed east near a ditch. He testified that he was in the wagon and his father was on the ground nearby; that while his father was husking corn, defendant came toward his father carrying a shotgun and said: "Run for it or I will shoot you," to which his father replied: "I can't run; I got to get my corn out," and that as his father was reaching for an ear of corn, defendant shot him. He testified further that after the shooting his father said to defendant, "Charlie, you killed me," to which defendant replied: "That's what I been aiming to do all summer." He stated that when the defendant fired the gun his father was five corn rows (15 to 18 feet) from defendant. His testimony tends to show that defendant was in the ditch when the shot was fired, but that he had moved down the ditch a few feet from where he had been working at the trap. There is evidence that the ditch was about three feet deep.

John Barnes testified that just prior to the shooting he and Lackey were husking corn in the field east of where

his father was, and that he saw defendant going down the ditch toward the place where witness' father and Harry were. That he, the witness, went in that direction and when near he saw his father raise his hand to husk an ear of corn and the defendant shot him. He testified that the distance between Barnes and defendant at the time of the shooting was about five corn rows. He also testified defendant said: "Run Floyd or I will kill you." He stated the shooting occurred about half an hour after they had unloaded the corn at the crib. The ditch banks were covered with brush, weeds and small trees which, it is contended by defendant, were so dense as to prevent John from seeing his father or the defendant when the shooting took place.

Lackey was working with John Barnes, and when John started across the field he made the remark someone was over there, "and I followed. When I came to the ditch the shooting took place," and "I heard Floyd Barnes say: 'Well Charlie you killed me," and defendant said: "Yes, I know. That's what I meant to do." He did not see the actual shooting.

The evidence of the defendant is that Barnes passed near him when he was working at his trap in the ditch, that he and Barnes looked at one another but nothing was said, that Barnes proceeded on east in his wagon and came to a stop in a corner formed by the junction of two ditches. He stated that the place where Barnes stopped his team and wagon was forty or fifty yards from where defendant was in the ditch near the trap. He further testified that Barnes got out of his wagon and came toward him, that when Barnes was ten or fifteen steps from him, Barnes said: "You crazy old fool, I thought I told you to stay up at the house." That Barnes had a rock in his right hand the size of a pint cup, a husking peg in his left, that he advanced toward witness with his right arm raised in a position ready to throw and said to defendant that he would beat his brains out. Defendant testified that he told

Barnes to get back, that he didn't want trouble, and that when Barnes continued to advance he shot him. He said that after the shooting Barnes said: "Charlie you shot me," to which defendant replied: "You made me do it and I am sorry of it." On cross-examination, he testified that he did not know whether Barnes threw the rock at him or not. A deputy sheriff who was present when defendant was taken into custody testified that defendant told him at that time that he was ten or fifteen steps from Barnes when he shot him.

Defendant testified that about a week before the shooting he and Barnes had a conversation during which he asked Barnes to check the records each had kept, so that the division of the corn might be completed. He said that Barnes stated that the division had been made, that there was nothing to compare and he refused to produce his own records. He said Barnes jumped out of his wagon "like he was going to do something;" that he told Barnes he did not want trouble, only he wished to check one record against the other. Defendant says that later the same day he endeavored to get Barnes to compare the records on the division of the corn and that Barnes refused. He said that the conversation occurred in the presence of one of Barnes' sons, either John or Harry. Floyd J. Barnes, aged 17, a son of the deceased, testified he was present and heard the conversation, that his father had his account book and that he and the defendant compared them and that no difficulties arose.

According to defendant's evidence, on the Sunday morning following the foregoing occurrence, he met Barnes in the public highway, that Barnes was riding in a wagon and he asked Barnes to husk some white corn as he wanted to make immediate sale of it. He said that Barnes told him that he would determine which corn should be husked, that defendant had nothing to do with it, and told defendant to stay at his house. He further testified that he tried

to reason with Barnes, but that Barnes picked up the wagon endgate and came at him, and he, defendant, ran to the house. On cross-examination, he stated one of the Barnes boys was in the public highway about 100 yards from where he and Barnes were talking. On rebuttal, John Barnes testified he was down the road and saw his father and defendant talking, that he did not hear their conversation, but that his father did not pick up a wagon endgate and run toward defendant and, in fact, did not get out of the wagon.

Defendant testified that within the two days following the Sunday meeting, he and Barnes met on one or more occasions but that nothing was said by either of them in regard to their previous dispute. He said that he noticed Barnes appeared "cool."

The medical testimony shows that a space some five or six inches in diameter was lacerated and bruised by the shot and that the opening into the abdomen was about two inches in diameter. It also shows that the pellets had taken an upward course in the body and that some of them punctured the liver. Barnes was removed from the field to the hospital and died in about three hours after the shooting.

The sheriff testified that when he arrested defendant about 11 o'clock that morning, defendant was carrying a double-barreled 12-gauge hammerless shotgun, and that the gun was loaded. He also stated that defendant inquired if Barnes was dead; that he (the witness) told him he did not know, that he had been removed to the hospital; that in reply defendant said he must be dead, that he was ten to fifteen steps from him when he shot. The deputy sheriff's evidence corroborated the sheriff's evidence on this point.

John Henry Barnes, a son of the deceased, and Charles Lackey, a neighbor boy, testified at the coroner's inquest. Questions were asked on cross-examination in this case to

lay the foundation to impeach them with the questions and answers given at the inquest. The questions were in bad form and the coroner's record of questions and answers was poorly kept. There is nothing in the coroner's testimony which covers the precise question asked by way of impeachment, nor was the transcript of such evidence produced. At the most, the impeaching evidence tended to show the two witnesses had testified at the inquest, that they were husking, and did not testify to seeing anything until they heard the shot, and that they then went to the scene of the shooting. In fact, the testimony of the coroner is largely negative in that some facts testified to on the trial were not mentioned at the inquest.

Clyde Black, defendant's nephew, testified that about twenty days after the killing he visited the scene of the shooting and at that time he saw a steel trap in the ditch, (presumably the one at which defendant was working when Barnes passed) and found paper wadding out of a shotgun shell on the bank of the ditch opposite where the trap was located. He does not mention finding a rock of the size of a pint cup.

After the shooting Barnes climbed into the wagon and his sons, Harry and John, and Charles Lackey drove to the public highway. Floyd Brooks, Dewey Crider and two others met the wagon at the highway with an automobile and removed Barnes from the wagon to the automobile and took him to the hospital at Shawneetown. He died about 45 minutes after entering the hospital. Barnes talked to Brooks and Crider while he was in the wagon and after he entered the automobile en route to the hospital. The statements he made to these witnesses were introduced as dying declarations. Defendant contends they were improperly admitted, that the foundation was not sufficient to constitute them dying declarations.

When Brooks and Crider first saw Barnes he was lying on his stomach in the wagon. Brooks testified that while

in the wagon Barnes said he was shot, he was killed, and that en route to the hospital he asked Barnes why defendant had shot him and that Barnes replied that defendant had come to the field and told him to run. He quoted Barnes as having said to defendant, "Charlie I can't run, I got to shuck the corn, got to making a living for my family." Crider said the first thing he heard Barnes say, when Brooks raised him up while yet in the wagon, was: "I am killed." He then stated that Hubbs had shot him over nothing, and that he didn't have it coming to him. Crider said that while in the automobile he asked Barnes about the welfare of his soul and that Barnes's reply in part was: "I hate to die and leave my family, my wife and little children," and that he said that he didn't feel that he had it coming to him.

Dying declarations are statements of fact concerning the cause and circumstances of the homicide. To make them admissible in evidence as dying declarations, it must appear that they were made by the victim under the firm belief and conviction that death was imminent and near at hand. *People* v. *Savant,* 301 Ill. 225; *Dunn* v. *People,* 172 Ill. 582; *Simons* v. *People,* 150 Ill. 66; *Starkey* v. *People,* 17 Ill. 17.

The doctor who attended Barnes and gave him medical care upon his arrival at the hospital testified that when Barnes arrived he was in a severe state of shock and suffering intense pain. The evidence of those who took him to the hospital in the automobile shows that Barnes's mind was clear when the statements were made. Defendant argues that since Barnes was taken to the hospital instead of his home, such fact indicates that he exercised a choice which was indicative that he possessed hope that hospitalization might save him from death. In the first place, there is no evidence that Barnes gave any directions as to where he should be taken, and secondly, a declaration made under the circumstances shown should not be rejected as a dying

declaration on such a nebulous ray of hope. The statements as testified to by Brooks and Crider were admissible in evidence as dying declarations.

It is next contended that the shotgun taken from defendant when he was arrested should not have been admitted in evidence for the reason that it was not shown to have been the gun with which defendant shot Barnes. The evidence is that defendant had a gun in his hand when he came to the cribs on the morning of the shooting, that he had a gun when he started on his trip to examine his traps, and that he had it with him when he was examining the particular trap where the shooting occurred. No witness was asked if the gun marked as an exhibit was the one that defendant was carrying at the various times and places, but the witness Harry Barnes testified that the gun which defendant used to shoot his father was a double-barreled shotgun. The sheriff and his deputy who took the gun from defendant when arrested described it as a double-barreled, 12-gauge, hammerless shotgun. In view of defendant's own evidence we are satisfied there was sufficient evidence to admit the gun and the shells in evidence as exhibits.

To our minds the evidence shows the guilt of the defendant beyond a reasonable doubt, leaving for consideration only alleged errors of law.

The court gave 17 instructions on behalf of the People, and 25 for defendant. Defendant complains of 15 of People's instructions and contends that an instruction of his which was rejected should have been given. People's instructions numbered 1, 3, 5 and 6 are challenged on the ground that they ignored defendant's claim that he acted in self-defense. Such contention involves the application of several well-established principles. Instructions should be taken as a series. It is not necessary that a single instruction should state either all the law of the case or all the law on a given subject. (*People* v. *DeRosa,* 378 Ill.

557; *People* v. *Willy,* 301 Ill. 307; *Lilly* v. *People,* 148 Ill. 467.) It is sufficient if the instructions, when considered as a whole, fully and fairly announce the law applicable to the theories of the prosecution and the defendant, respectively. *People* v. *Hicketts,* 324 Ill. 170.

People's instruction No. 1 defines murder in the language of the statute and instructions 3, 5 and 6 define malice. Except for the challenge now made to instructions 3, 5 and 6, they have been approved in substantially the same form in a number of cases. (*People* v. *Hartwell,* 341 Ill. 155; *People* v. *Lucas,* 244 Ill. 603; *Parsons* v. *People,* 218 Ill. 386; *McCoy* v. *People,* 175 Ill. 224.) Instruction 6 embodied the same principle of law contained in instruction 5 and should not have been given. Standing alone, we would not regard the giving of the duplicate instruction as ground for reversal. None of the questioned instructions directed a verdict.

Other instructions bearing on defendant's defense of self-defense which should be considered in connection with instructions 1, 3 and 5 are People's instruction 17 and defendant's instructions 6, 16, 24 and 25. People's instruction 17 told the jury that no threats Barnes made could avail defendant unless at the time defendant made the assault charged he was actually assailed or had acted on evidence whereby he, as a reasonable man, believed or was justified in believing that he was in danger of receiving great bodily injury or of losing his life at the hands of Barnes. Defendant's instruction 6 was that when a man is unlawfully assaulted in a place where he has a right to be, he has the right, under the law, to defend and to repel force with force and use whatever means is necessary or apparently necessary to him, acting as a reasonable person under like circumstances, and, if he believe that his life is in danger or that he is in danger of receiving great bodily harm, he has the right to take the life of his assailant if he believes it is necessary or if it appears to him to be

necessary under the circumstances, acting as a reasonable person. It applied the abstract propositions of law as stated to facts if proved, and concluded by directing a verdict of not guilty if such facts were established by the evidence.

Defendant's instruction 16 told the jury that self-defense was a lawful defense and that it was not necessary that a man be placed in real danger of losing his life or suffering great bodily harm, but that it was sufficient if he be placed in fear of losing his life or receiving great bodily injury when acting as a reasonable person under like circumstances, and if he acts under the influence of such fear in defending himself, he will not be held responsible criminally for his acts. Instruction 24 covered the same subject matter included in defendant's instructions 6 and 16, but with greater elaboration of principles. Defendant's instruction 25 gave a detailed outline of the evidence relied upon to sustain defendant's claim that he acted in self-defense and directed that, if the jury found such facts to have been proved, it should find he acted in self-defense. It concluded by directing a verdict for the defendant.

In view of the instructions on self-defense, it cannot be said that the giving of an instruction defining murder in the language of the statute, or instructions defining malice were likely to mislead the jury into believing that such instructions supplanted other instructions on the law of self-defense. People's instructions 1, 3 and 5 were in explanation of the theory of the prosecution and defendant's instructions 6, 16, 24 and 25 covered the law of self-defense. *People* v. *Gibson,* 385 Ill. 371; *People* v. *Moriarity,* 380 Ill. 148; *People* v. *Geary,* 297 Ill. 608.

People's instruction 4 undertook to define the term "malice aforethought." It is claimed these words were unduly emphasized by being enclosed in quotation marks,

and that this type of instruction has been criticized when it ignores the law of self-defense, because one may intentionally kill another in self-defense and not be guilty of murder. (*People* v. *Penman*, 271 Ill. 82.) However, this instruction contained a proviso modifying the effect of malice, in that the jury must further believe "that no circumstances exist excusing or justifying the act or mitigating it so as to make it manslaughter."

Other criticisms are made, including the fact the first sentence of the instruction is incomplete and meaningless. At most the instruction embodies an abstract proposition of law which has been often criticized by this court. It is to be observed however that neither the People nor the defendant offered an instruction on manslaughter, thus indicating that both sides considered the defendant guilty of murder, or nothing. Under such circumstances, while the instruction is obscure and incomplete yet, upon the whole, it was not prejudicial to the defendant, because it indicates that a design to effect death may be excused or justified, or the killing may be reduced to manslaughter.

While we do not approve of this form of instruction, yet, any possible effect it might have had upon the verdict, is cured by defendant's instruction 25, which reads as follows: "You are instructed by the Court that if you believe from the evidence in this case that the defendant, Charles Riley Hubbs, was in a ditch in his corn field where he had a trap, and if you further believe that while he was at said trap breaking the ice away from the same, and if you believe from the evidence that while he was so doing, the deceased Floyd Barnes, had a corn pick in one hand and a rock the size of a pint cup in the other hand, and if you further believe from the evidence that he approached the said defendant while the defendant was in the said ditch as aforesaid and said to him, 'You crazy old fool, I told you to stay at the house,' and if you further believe from

the evidence that the said deceased further said to Charles Riley Hubbs, 'I am going to beat your brains out,' and if you further believe from the evidence that when he made such remark he was advancing toward the said Charles Riley Hubbs, and if you further believe from the evidence that the said Charles Riley Hubbs told him to stay back, that he didn't want any trouble, and if you further believe from the evidence that the said Floyd Barnes went closer to the said Charles Riley Hubbs and drew back his right hand as if to throw the rock, and if you further believe from the evidence that by reason thereof, the said Charles Riley Hubbs was put in fear of losing his life or suffering great bodily harm at the hands of the said Floyd Barnes, then you are instructed that the said Charles Riley Hubbs had the right to defend himself and use whatever means he thought was reasonable and necessary to protect his life or to prevent him from receiving great bodily harm, and if he acted under the influence of those fears and believed that it was necessary so to do, and thereby killed the said Floyd Barnes you are instructed that he was justified in so doing, and in such case you would be justified in finding the defendant, Charles Riley Hubbs, not guilty." This instruction embodies all of the facts constituting the defense, and for practical purposes directed the jury to acquit the defendant, if they believed his story. We are satisfied the defendant was not prejudiced by the giving of People's instruction 4.

People's instruction 7 was an explanation of what constitutes malice aforethought. The first paragraph was condemned in *People* v. *Duncan,* 315 Ill. 106, because it practically eliminated self-defense. Standing alone it was objectionable. However, defendant's instructions 6, 7, 13 and 24 thoroughly explained that killing another intentionally in self-defense was excusable, and the portion of 24 reading: "If the death of his assailant results from

the reasonable defense of himself he is excusable, whether he intended to kill him or not," clearly recognized that self-defense eliminated all question of malice. The instructions as a series correctly stated the law, and hence the giving of instruction 7 was not reversible error.

Defendant misapprehends People's instruction 8 when he criticizes it as an instruction covering proof of intent as alleged in the indictment. It was a charge that the law presumes a man to intend the reasonable and natural consequences of any act intentionally done. Instruction number 9 undertook to define what was meant by the term "reasonable doubt." The giving of the instruction would not be reversible error, but it has been said repeatedly that the term "reasonable doubt" carries its own meaning and that no instruction undertaking to define it need be given. Instruction number 11 directed a verdict of guilty. It is a mere abstract proposition of law and not based upon the facts in evidence upon which the prosecution rested its case. The instruction should not have been given.

People's instruction number 12 is subject to the criticism that it refers to the defense of habitation or property. There is no evidence in this case that defendant fired the shot in the defense of his home or property. People's instruction number 12 was subject to the criticism directed against it, but could not have misled the jury as no such point was urged by either side.

Complaint is made of People's instruction number 15, on the ground that it took from the jury the question of determining whether the evidence introduced as the dying statements of deceased were dying statements. Whether statements were admissible in evidence as dying declarations was a question of law for the court. The weight, if any, to be attached to such statements was a question for the jury. The instruction is not subject to the criticism directed against it. We agree with defendant's contention

that instruction number 17 would have been better had it used the words "assail" and "assailant" in lieu of the words "assault" or "assaulted." Defendant's refused instruction announced a correct principle of law, but there was no error in rejecting it, for the same principle was embodied in other instructions.

The jury was the judge of the credibility of the witnesses and of the guilt of the defendant. The testimony of the witnesses for the People tends to show that without any provocation whatever the defendant, armed with a double-barreled shotgun, walked to the corn field where the deceased was working, and without any provocative act upon the part of the deceased shot and killed him. The dying declaration of the deceased corroborates the living witnesses in this respect, and other circumstances indicate it is improbable that an unarmed man would advance with hostile intent to one armed with a loaded shotgun.

On the other hand, the testimony of the defendant indicates there had been previous trouble, and with this knowledge of such trouble he walks through the field to the place where the deceased was working, upon the pretext he is examining his traps set in a nearby ditch, and the deceased with a corn pick, which nobody describes as being a deadly weapon, and with a large rock, which nobody found, attempted to assault him, and while he was at least fifteen feet away was shot by the defendant.

No doubt the inherent weakness of this story impressed the jury, and we have no doubt that the verdict of the jury was justified. The killing in this instance is admitted by the defendant, and, that being the case, the statute provides that "the burden of proving circumstances of mitigation, or that justify or excuse the homicide will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." (Ill. Rev. Stat.

1947, chap. 38, par. 373.) The evidence upon the part of the prosecution does not disclose that the offense amounted to manslaughter, nor does it disclose that the accused was justified or excused in shooting the deceased.

When this provision of the statute is considered in the light of the testimony, we are satisfied that the judgment of the circuit court of Gallatin county is correct, and it is accordingly affirmed.                    *Judgment affirmed.*