(No. 33798.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE KELLY, Plaintiff in Error.

*Opinion filed May 23, 1956—Rehearing denied September 12, 1956.*

GERALD W. GETTY, Public Defender, of Chicago, (JOHN M. BRANION, of Chicago, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, EDWIN A. STRUGALA, IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, WILLIAM L. CARLIN, and FRANK G. WHALEN, of counsel,) for the People.

Per CURIAM: This case, on writ of error from the criminal court of Cook County, is here for review of a judgment on a jury verdict finding the defendant guilty of murder and fixing punishment at death. The common law record and a full transcript of the proceedings are before us.

It is undisputed that about 1:00 P.M. on February 22, 1954, in the rear room of a tavern called the Corner Liquor

at 45 East Garfield Boulevard in Chicago, the defendant George Kelly shot the tavern operator Robert Gottstein, two bullets going through the brain, and Gottstein died of these wounds. The defendant does not deny the shooting, but claims self-defense and alleges that certain irregularities occurred in the trial. As presented and argued by both the People and the defense, the issue involves why the defendant was in the tavern, particularly why he was in the rear room, what precisely happened, and what the defendant said at the time and in later statements bearing on his actions and intent.

The People presented six material witnesses in this regard. Eddie Towns, a porter at the tavern, said Gottstein was sleeping in the back room and that a waitress asked him to go back there for some ice. He said that when he went for the ice, the defendant followed him, put a gun on him, said "this is a stick-up," and in the back room told him to turn around. Then, he said, he heard a couple of blows like someone tapped another on the head; afterward, he heard a shot and somebody fell.

Mattie Cathey, the waitress, said the defendant was in the tavern from about 10:30 A.M. until the incident, that Gottstein waited on him and she served him beer and brought him some cigarettes, and that Gottstein went into the back room to lie down. She said she sent the porter for some ice and went about her business. When he did not return, she went after him, saw the defendant, heard a shot, didn't know what was going on, and ran.

Neil Wilson, a Chicago Park District police officer, said he saw a crowd at the tavern, stopped the car, went in, got a description of the defendant, and began patrolling the neighborhood. He said he saw him, approached him, and asked him why he had shot the man in the tavern, and that the defendant replied it was because the man shot at him first. The officer said that on being asked his purpose in the tavern, the defendant said he was there to stick up the

place, and on being asked to tell the whole story, said "he went back with the intention of robbing the owner of the tavern and when he went in the back he said the tavern owner was asleep upon the couch and he said he aroused the tavern owner and told him to keep quiet and the tavern owner moved as if to get off the cot he was on and he said he hit him over the head with his gun; he hit him several times and the tavern owner when he struck him with the gun fell on the floor and he was in a kneeling position on the floor; and he saw the tavern owner going to his pocket for a gun and that he knew he had in his pocket and he said the tavern owner came out with the gun and fired a shot at him, and he stepped back several feet and fired twice at the tavern owner."

Charles Younger, a Chicago police plainclothesman, who went to the tavern about two o'clock after the incident, said the defendant told him he had been in the tavern the night before, had seen the proprietor put some money under the register, and on the day in question "went in there to stick the tavern up, to hold the proprietor up." He said that the defendant then told of following the porter into the back room and ordering him to waken Gottstein, and further ordering the wakened proprietor to remain still: "and that the man instead rolled to the floor, and that as he rolled to the floor that he struck him once on the head; the man tried to get up again and he struck him again on the head with his revolver; at that time the man went in his pocket and pulled a gun and fired a shot at him; thereupon he fired two shots at the proprietor."

All four of these witnesses identified the defendant and the homicide weapon, a Colt .38-caliber police special.

Eugene Precin, a stenotype reporter, and Lester Shapiro, an assistant State's Attorney, identified a question and answer statement taken from the defendant at 5:25 the afternoon of the shooting and signed about 11 o'clock the next morning. It was taken in the presence of Younger, Mattie

Cathey, Shapiro and Robert Parker, Younger's fellow-officer. It was signed in the presence of Younger, Parker, Wilson, and Shapiro. It contained Kelly's signature, spelled "Kelley," on each page, and on the last page over his signature, in his own handwriting, the statement: "I have read this statement and it is all true. Mr. Shapiro read one copy aloud to me which I follow by reading this statement." There is no contention made that this statement was involuntary.

Cross-examination of Towns, the porter, revealed that he had not prior to the trial told anyone else that the defendant had said "This is a stick-up" at the time of the incident. But on redirect he could not recall that anyone had ever asked him. On the same point, Younger said on cross-examination that he did not remember the defendant's ever admitting to him that he had told the porter it was a stick-up.

The written statement went into far greater detail than the oral admissions or direct testimony of the two tavern witnesses, but it was corroborative. Cross-examination of Shapiro revealed that he did not formally introduce himself as an assistant State's Attorney until a point on page four of the statement, that he was quite leading in some of his questions, and that he, rather than the defendant, used for the first time in the transcribed portion of the interview the word "rob." But it was clear from the whole transcript that Shapiro did introduce himself at the very outset, and that much of what went into the transcribed portion of the interview was the result of an earlier preliminary oral discussion.

The only defense witness was the defendant himself. His version of the incident was simple and direct. As he put it, he had been in the tavern the night before and bought a beer, giving Gottstein a ten-dollar bill. He said when he counted his change he had only $4.70 and called the matter to Gottstein's attention. He said Gottstein then snatched the bottle from in front of him and said "You have your

change. The best thing for you to do is get out of here because this is a neighborhood tavern." The defendant said he saw the imprint of the handle of a pistol in Gottstein's pocket when Gottstein reached in the pocket, so he left. But he said he went back the next morning to get his money and took the gun with him because he remembered the gun Gottstein had.

The defendant's version of the actual shooting is consistent with that of Mattie Cathey and Towns, except that the defendant denies striking Gottstein before Gottstein's shot, he denies telling Towns "this is a stick-up," and he says he first pulled the gun when Towns gave him a stiff arm at the door of the back room. In the defendant's words: "I asked Mr. Towns to turn the light on, and he turned the light on and then I tells him, 'Wake your boss up' and he woke him up. After he woke him up, after he woke him up, he raised up and he ups and rolls off on the floor and fires at me. Then in return I fire back at him. Before the firing I did not strike him with the gun, that was just made up. When I fired at him, I was scared. I mean just like a dream or something running down on you, you don't know what to do. I did not expect him to shoot at me when I went back there. I did not go back there to hold him up. I fired twice. After I fired twice, I stood up for awhile and then I told Mr. Towns 'You better call the police or an ambulance quick.' Then I ran out."

As to the oral admissions and written statement to the effect that he had gone to the place to rob Gottstein, that he had struck Gottstein over the head twice before any shooting took place, and certain other incriminating details, the defendant testified that at the police station "everybody had automatically got it in their head that I was there to stick the man up." He said he had never told anyone he had gone to the place for a holdup, and he said regarding his admissions of striking Gottstein over the head that he was lying and the stories were "made up" or "fiction."

On this record, the defendant here argues five main points: (1) Murder was not proved beyond a reasonable doubt. (2) There was error in the giving and refusing of instructions. (3) There was error in the admission of evidence. (4) The death penalty fixed by the jury was the result of prejudicial passion. (5) He was not tried by an impartial jury, because one petit juror was the wife of a member of the grand jury that voted the indictment.

The defendant argues that the testimony of Towns is unsatisfactory because it includes the statement that the defendant said "This is a stick-up," although Towns did not tell anyone, not even the investigating authorities, about any such declaration by the defendant. But the fact Towns told no one before the trial about the defendant's declaration does not prove that the defendant did not make it. For it is equally clear nobody asked Towns about it, and the facts that Towns did relate are all consistent with such a declaration. Moreover, the defendant admitted substantially the same thing to both Wilson and Younger within an hour after the killing.

The defendant argues that Mrs. Cathey's testimony cannot be relied on because she said on direct she did go into the back of the tavern and said on cross-examination she did not, and she said Gottstein had served the defendant about ten o'clock, while Towns indicated Gottstein was not in the front of the tavern from seven o'clock on. But these were minutiae which did not discredit the witness. Who was where in a busy tavern, with some 18 customers present, even where the boss was, and particularly who served whom during three or four hours prior to an incident which in retrospect dwarfs all others are not significant details. They would likely be neither observed nor recalled with precision. They are immaterial here. Likewise, whether she went back into the rear room, went to the back "part" of the tavern or started back when she heard the shots is not material. The defendant admitted before trial and testi-

fied at the trial that he was back there and did the fatal shooting. Her cross-examination statement was not pursued on any impeachment basis and may be considered as a correction of her direct. Her value as a witness is, at all events, not destroyed on the implications drawn by the defendant here.

The defendant goes to great length in an effort to show that the assistant State's Attorney led the defendant into making certain statements about the incident, calling him "a master craftsman" who substituted his own opinions and conclusions for statements of the defendant. Some of his questions were leading. But we cannot say that the leading questions were designed to put words in the defendant's mouth, to distort the truth, or do anything other than clarify the defendant's intentions which were otherwise rather unarticulated.

The result certainly was not to mislead the defendant, for he answered some important questions with direct "yes," others with "no," still others with modifying explanations, and on certain key points, did not follow but refuted the examiner. For instance, asked if it were not correct that he had been carrying a gun right along, he said "no." Asked when he got the idea to rob the place, he answered "well, when I seen that big bale of money he had." Asked why he waited from 10:30 until 1:00 before he tried to hold up the place, he answered "well, I had my chance, you know, when I could get by without anybody seeing me." Asked if he were pointing the gun at the porter, he answered "no." Asked if he had it in his hand, he said "yes." Asked if he had it pointed at the deceased, he said "well, yes, but I mean, I didn't have my hand on the trigger, no." Such answers indicate not a pliable subject in the hands of a corrupt and corrupting craftsman, but a witness at least alert to the implications of the questions and free and vocal enough to give discriminating answers.

On two key points, he volunteered answers either out-

side the scope of the question or wholly unsuggested. Asked what he said to the deceased, he answered "I said take it easy now, you know. *And then he went to raise up again and I struck him.*" Asked if there were anything else he wanted to tell, he said "Well, I mean, I didn't go in there to kill nobody. *I went in there to get some money,* that's all." (Emphasis supplied.)

As to why he went into the tavern, he summarized succinctly without any leading questions: "Q. And your reason for entering this tavern was what? A. To get some money. Q. By what method? A. What do you mean? Q. In what manner? A. Well, I thought I could just show my gun and get some." On questions and answers of this character, we cannot say that the defendant was led into any statements he did not mean to make, perverted into acquiescing in any assumptions of the examiner, or induced to distort the truth as to physical facts or as to his own intentions.

His own version and theory of self-defense is contained in the statement in these words: "Q. Well, didn't you say to him it was a stick-up or words to that effect? A. No, before I could say anything, he pulls his pistol and shoots at mé. And then in return, I shot back. Because it scared me, you know." Following this report, the examiner made no attempt to destroy the defendant's flat denial of any "stick-up" declaration.

It would serve no useful purpose to recount here the full details of the lengthy question and answer statement. It should be made clear, however, that we have examined it in close detail, and find that no unfair advantage of the defendant was taken and that there is nothing involuntary, coerced, or distortive about it.

While it is not a full confession of a shooting in the course of an armed robbery expressly intended, it contains numerous admissions corroborative of the oral admissions given to the two officers.

On perhaps the most crucial point in the whole case—

who made the first direct aggression in the back room—the defendant's statement is not the result of any leading question, but is volunteered and outside the scope of the question. He was asked about what he said to the deceased and answered, "I said take it easy now, you know. And then he went to raise up again and I struck him." This is corroborated by the evidence of cuts on the head of the deceased, as shown by the autopsy.

Assuming for purposes of discussion that the defendant went to the tavern to collect $5 he claims to have been shortchanged, he had no right to do so at the point of a gun. He had no right to go from the public portion of the tavern to the keeper's private rear room, nor to menace the man's porter on the way. Yet he trespassed into the private room, forced the porter to waken his boss, and pointed a loaded gun at the sleepy man. The defendant was the aggressor. If the deceased rolled off the cot and went for a gun, it was not until he had been struck severe blows on the top and rear of the head by the gun in the defendant's hand. And in such circumstances, the defendant's final fatal act cannot be excused as self-defense when he himself had brought on the action of the deceased.

This is settled law. When a person has sought and brought on the difficulty he cannot invoke the law of self-defense unless he has in good faith declined further struggle. Stanton, Illinois Criminal Law & Practice, sec. 1884, citing ten Illinois cases from *Adams* v. *People*, 47 Ill. 376, to *People* v. *Grosenheider*, 266 Ill. 324.

His denial that he struck the deceased when the sleepy man "raised up"—before any shooting at all is inconsistent with his own statements to Shapiro and at the inquest which he later says were lies, "made up," or "fiction." He explains his inconsistent inquest statement as made when he was "afraid," but he does not explain the alleged lie to Shapiro. His denial also flies in the face of the cuts on the top and rear of the deceased's head. And on this crucial point, the

attitude and conduct of the parties before any shots were fired and before the deceased had even reached for his gun, it is defendant who is unreliable.

It is of course our duty to resolve all facts and circumstances in evidence on the theory of innocence rather than guilt, if that reasonably may be done, and where the entire record leaves us with any grave or substantial doubt of guilt, we must reverse. (*People* v. *Sheppard,* 402 Ill. 347.) This duty weighs most heavily in a death-penalty case. But we have examined the evidence at length and with care and can find no such doubt here.

The defendant's denials which, if believed, might be considered consistent with his self-defense theories create, at best, a conflict in the evidence. But a conflict in the evidence does not of itself establish a reasonable doubt, and a jury verdict based on credible and substantial evidence is not rendered reversible by the fact that there was other evidence in the case which might, if believed, have resulted in a different verdict. *People* v. *Martin,* 304 Ill. 494; 15 I.L.P., Criminal Law, sec. 464.

We next discuss the instructions, which we have considered as a series and with regard to the individual rulings complained of as error.

The defendant objects to an instruction which advised the jury that if they find, after considering all the evidence, that any witness testifying on behalf of either side wilfully and corruptly testified falsely to any fact material to the issue in the case, they have the right to disregard the testimony of such witness, except in so far as corroborated by other credible evidence. It is urged that this instruction leaves undefined the facts material to the issue, and the giving of it constituted reversible error. However, other instructions fully covered what the material issues were, and the instruction was therefore proper. *People* v. *Skelly,* 409 Ill. 613, 627.

Four of the State's instructions are complained of for

the reason that no mention is made of self-defense. These four deal with deliberate and dangerous assault as implying malice, intent shown by circumstantial evidence, malice aforethought without any considerable lapse of time between the first thought and the act, and malice express or implied in the statutory definition. The giving of these instructions was not erroneous, because self-defense was adequately covered in two other given instructions. "It is not necessary that a single instruction should state either all the law of the case or all the law on a given subject. * * * It is sufficient if the instructions, when considered as a whole, fully and fairly announce the law applicable to the theories of the prosecution and the defendant, respectively." *People* v. *Hubbs,* 401 Ill. 613, 622-3. See also *People* v. *Horton,* 4 Ill.2d 176.

The defendant complains of an instruction which told the jury that the intent alleged in the indictment had to be shown, claiming that the indictment alleged no intent and for murder it is sufficient to prove general malice as distinguished from specific intent. This instruction could not have prejudiced the defendant, but, if anything, was likely to inure to his benefit. See *People* v. *Guido,* 321 Ill. 397, 413.

Also criticized is an instruction defining malice as including "not only anger, hatred and revenge, but every other unlawful and unjustifiable motive" The instruction is vague in that "other unlawful and unjustifiable motive[s]" are left undefined, but it has been approved by this court. (*McCoy* v. *People,* 175 Ill. 224, 229.) And in any event, as applied to the circumstances here, we do not believe the instruction could have had a misleading effect. What harmful effect it might have had is not suggested by the defendant, and we can conceive of none.

Finally, the defendant complains of an instruction which stated that if the defendant entered the place to rob it and pointed a revolver at the deceased, and some other person

fired the first shot, after which the defendant shot and killed the deceased, or aided, abetted or assisted, advised or encouraged some other person to do so, that is, if his own deliberate and wrongful act brought on his need for any self-defense, he cannot avail himself of such a defense and the killing would be murder. We do not see why any matter of aiding, abetting, assisting, advising, or encouraging someone else was inserted in this instruction. For there were no accomplices in the case, and whatever acts were charged were by the defendant on his own. However, the matter is mere surplusage and not prejudicial.

On the whole, we believe the series of instructions fairly stated the issues and the law and provided a fair and complete guide for the jury. If the series of instructions taken together satisfactorily serve this purpose, without prejudice to the defendant, inaccuracy or erroneous or misleading matter which is not harmful provides no ground for reversal. (*People* v. *Wilson*, 1 Ill.2d 178; *People* v. *Hubbs*, 401 Ill. 613; 15 I.L.P., Criminal Law, sec. 74.) This general proposition has been particularized in application to cases involving self-defense. *People* v. *McClain*, 410 Ill. 280; *People* v. *Hubbs*, 401 Ill. 613.

The defendant's contentions regarding improper admission of evidence and regarding a death penalty resulting from prejudicial passion are not argued, and are considered waived.

The final contention is that the trial court erred in denying a motion for new trial based on the fact that one petit juror was the wife of a man who was on the grand jury which returned the indictment. The defendant contends that we must conclude from a hearing on the matter that she suspected this when selected as a juror and became convinced of it after evidence began coming in; that she deliberately secreted from the trial court the fact her husband had been on the grand jury; that she knew some or all the facts without getting them from the trial witnesses;

and that she was thus not "uncommitted" and impartial on the question of guilt. But the husband did not discuss any grand jury cases with her during his service, and was out of town and not communicating with her during hers. She knew that he had been on a grand jury, but did not until after verdict confirm her suspicion that he might have sat on the one which returned the indictment here. She neither testified falsely on *voir dire* or later, nor withheld any answers regarding her knowledge or lack of knowledge of the facts in the case before her. She said she would have revealed these things if asked, but thought the fact her husband had been on a grand jury had no bearing on the case. In all events, he said affirmatively that he had not discussed grand jury cases with her, and she said affirmatively that when she served on the jury she had never heard anything about this particular case before.

In these circumstances, the defendant's point amounts to a bare assertion that a petit juror related to a grand juror has, as a matter of law, not only knowledge of the cases considered by that grand jury, but preconceived convictions regarding guilt or innocence as to indictments voted by it. Inferences, in our opinion, cannot be carried this far. And cases calling for new trial where a juror has an opinion, prejudice, or partiality, either express or implied from circumstances or from deception regarding the matter, do not apply.

Where there is no such opinion, or the opinion is removable or an opinion which is not fixed, the juror is not disqualified. (*Leach* v. *People,* 53 Ill. 311; *Wilson* v. *People,* 94 Ill. 299; Stanton Illinois Criminal Law & Practice. sec. 1054.) It has been so held in a capital case. *Wilson* v. *People,* 94 Ill. 299.

On a careful review of the whole record, we believe the defendant had a fair trial, and that the jury verdict was fully justified by evidence which warranted belief and which, if believed, proved the defendant guilty beyond a

reasonable doubt. In such a case, the defendant's denials of incriminating aspects of the case and a theory of innocence based on such denials do not require the rejection of the evidence against him, nor render improper a verdict based on such evidence.

As discussed above, the fact that the defendant did not fire the first shot makes him no less the original aggressor, and in the circumstances no less guilty as a matter of law.

The judgment of the criminal court of Cook County is affirmed, and the clerk of this court is directed to enter an order fixing October 5, 1956, as the date on which the original sentence entered in the criminal court of Cook County shall be executed. A certified copy of the order shall be furnished by the clerk of this court to the sheriff of Cook County.

*Judgment affirmed.*